[No. B152959. Second Dist., Div. Four. Apr. 1, 2005.]

JUDY BOEKEN, as Trustee, etc., Plaintiff and Respondent, v.
PHILIP MORRIS INCORPORATED, Defendant and Appellant.

**COUNSEL**

Arnold & Porter, Murray G. Garnick, Robert A. McCarter, Ronald C. Redcay and Maurice A. Leiter for Defendant and Appellant.

Michael J. Piuze for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.—**

## BACKGROUND

Richard Boeken filed this action on March 16, 2000, alleging various theories including negligence, strict product liability and fraud resulting in personal injuries caused by his cigarette addiction.[1] The complaint alleges that Boeken began smoking in 1957, when he was a minor, that he smoked Marlboro and Marlboro Lights, both manufactured by Philip Morris USA, Inc., and that he was ultimately diagnosed with lung cancer in 1999.

The cause was tried to a jury over approximately nine weeks, beginning in March 2001. The jury found that Philip Morris products consumed by

---

[1] Since Philip Morris and Boeken have both appealed, we shall refer to them by name. Richard Boeken has died, but we shall continue to refer to respondent and cross-appellant as Boeken, since his successor in interest is his widow of the same name, Judy Boeken, trustee for the Richard and Judy Boeken Revocable Trust.

Boeken were defective either in design or by failure to warn prior to 1969, resulting in injuries to Boeken. The jury also found liability to Boeken based upon fraud by intentional misrepresentation, fraudulent concealment, false promise, and negligent misrepresentation, concluding that Boeken had justifiably relied upon fraudulent utterances and concealment by Philip Morris. Compensatory damages in the amount of $5,539,127 were awarded by the jury. It also assessed punitive damages in the sum of $3 billion dollars.

A Philip Morris motion for judgment notwithstanding the verdict was denied. Its motion for new trial was conditionally granted solely on the issue of punitive damages unless Boeken accepted a reduction in punitive damages to the sum of $100 million, in which case the motion was denied. Boeken consented to the reduction and an amended judgment was entered on September 5, 2001. Philip Morris and Boeken each filed timely notices of appeal.

We issued our first opinion on September 21, 2004, affirming the judgment but further reducing punitive damages to the amount of $50 million. Philip Morris and Boeken each filed petitions for rehearing, which we granted. We heard further argument on February 15, 2005. After reconsidering the issues raised by the parties, we again affirm the judgment and order reduction of punitive damages to $50 million, if Boeken accepts the remittitur. If he does not, we affirm the order of the trial court granting a new trial to Philip Morris on the issue of punitive damages.

## EVIDENCE REGARDING SMOKING, ITS EFFECTS AND THE FALSE CONTROVERSY[2]

Physicians had the ability in the mid-nineteenth century to diagnose lung cancer. It was a rare disease until some years after the first commercial prerolled cigarettes were introduced in the United States in 1913. In the 1930's, there was a sharp increase in the number of cases diagnosed, and by the end of World War II, its incidence had increased 20-fold.

Boeken's epidemiological expert, Dr. Richard Doll, joined Professor Bradford Hill at the London School of Hygiene in the late 1940's, to conduct the first studies in the United Kingdom to determine the cause of lung cancer, and why its incidence had increased so dramatically. Statistics

---

[2] Because Philip Morris challenges the sufficiency of the evidence on various issues, we set out the facts in the light most favorable to the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

established a causal connection between smoking and cancer, and Doll and Hill published their results in 1950 in the British Medical Journal.[3]

A Dutch scientist had published a paper in 1948, having reached the same results, and in 1950, a smaller American study was published in the Journal of the American Medical Association by American scientists Drs. Graham and Wynder, also reaching the same conclusion. There had been earlier studies in Germany, but they were not given much weight because the scientific methods used were not optimal.

The popular media and the United Kingdom Department of Health were not convinced by the Hill and Doll study, and so the two undertook a years-long study of 40,000 smoking and nonsmoking English doctors who did not have lung cancer. They thought it would take 5 years to complete the study. But in 1954, after two years and 35 deaths due to lung cancer, they felt the results were clear and published their findings immediately in the British Medical Journal. This study was more widely accepted than the previous studies and changed attitudes considerably.

The American Cancer Society then undertook a two-year study with 190,000 subjects, in order disprove Doll's conclusions. In 1954, its scientists reported their belief that the conclusions reached in the British study had been correct. Even after publication of Doll's second study and the American Cancer Society study, some leading scientists still questioned the link between lung cancer and smoking, and opinion among scientists was evenly divided until about 1956. At that time, opinion had firmed up quite definitely among scientists that smoking caused lung cancer.

Neil Benowitz, M.D., Boeken's addiction expert, testified that nicotine is addictive, and the most effective way addiction is achieved is delivery by cigarette smoke.[4] Withdrawal symptoms include irritability, anxiety, insomnia, trouble concentrating, nervousness, and dysphoria (mild depression), and can last for months after quitting. Some symptoms last forever. Smokers use denial and rationalization to continue doing what is obviously or apparently

---

[3] Doll has been awarded many honors over the years for his work on tobacco, including knighthood in 1971.

[4] More specifically, Benowitz testified that nicotine is similar to a hormone called acetylcholine (ACH), which is responsible for nerve communication, and is highly concentrated in the brain. ACH binds to receptors which release other hormones that affect mood and behavior. Nicotine attaches to the same receptors, but in larger amounts, and activates them to a greater extent. Nicotine becomes necessary for the brain to function normally. Smoking creates an aerosol, and when the gas goes directly to the lungs, it delivers the nicotine instantly to the heart and brain, achieving its effect within 15 seconds. This immediate reinforcement encourages addiction. Thus, the smoking (of any addictive substance) is the delivery system that causes the fastest addiction.

harming them and may acknowledge a general risk, but given a choice of conflicting opinions, they will choose the opinion that supports continued tobacco use.

In 1954, the tobacco industry embarked upon a decades-long strategy to create public doubt about the "health charge" through "vigorous" but not actual denial, such as by claiming that experimental proof was still lacking, and that the statistics were not to be trusted, because they were poorly obtained or grossly exaggerated.[5]

First, several tobacco companies, including Philip Morris, formed the Tobacco Industry Research Committee (TIRC), a public relations organization, to counter the "anti-cigarette crusade" by providing "balancing information" regarding "unproven facts."[6] To announce its formation, it published "A Frank Statement" in newspapers across the country. The "Frank Statement" claimed: "Distinguished authorities point out . . . that there is no proof that cigarette smoking is one of the causes [of lung cancer] [and] statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed, the validity of the statistics themselves is questioned by numerous scientists."[7]

According to Dr. Doll, the Frank Statement was a "bald untruth." While some scientists had questioned the link, most knew at the time of the Frank Statement that smoking caused lung cancer.

Tobacco studies continued throughout the 1950's in many countries, including Japan, Denmark, and France. In 1957, the United States Heart and Lung Institute, the National Cancer Institute, National Institute of Health, and American Cancer Society appointed a joint committee to advise on the state of the science, and concluded that smoking was a cause of lung cancer. The Auerbach study, published in 1957, showed pictures of various stages to demonstrate how the risk of lung cancer increased after a certain number of years of smoking.

---

[5] Philip Morris's knowledge and actions were shown by the testimony of several former employees of the research and development department, which operated several laboratories, and by a series of internal memoranda between company officers assigned to the labs in the 1950's through the 1980's, including Helmut Wakeham, William L. Dunn, T.S. Osdene, and Robert B. Seligman.

[6] At some time in the late 1950's or early 1960's, the Council for Tobacco Research (CTR) replaced the TIRC.

[7] The Frank Statement also assured the public that the industry was concerned about the possible health effects of tobacco and was researching the question, and promised that it would inform the public immediately if it found smoking tobacco to be harmful. The promise was false. Philip Morris's own expert, Dr. Richard Carchmann, testified that the tobacco industry did not publicly admit that smoking was harmful until approximately 2000.

In 1960, the World Health Organization issued a report stating that smoking was a cause of lung cancer, and an editorial in the New England Journal of Medicine stated that no responsible observer could deny the association. Scientists did not yet know what specific substance in cigarette smoke caused lung cancer, but it was proven by 1953 that cigarette smoking caused it by some means, and by 1960, it was indisputable.

Nevertheless, Philip Morris and other tobacco companies continued their campaign of doubt. TIRC continued its work, issuing press releases, making personal contacts with journalists, providing "favorable" materials for editorials, articles, and columns, and providing assistance to the authors of such books as *You Don't Have to Give Up Smoking* and *Smoke Without Fear*.

A 1957 TIRC press release quoted its chairman and scientific director as saying, "No substance has been found in tobacco smoke known to cause cancer in human beings." The statement was literally true in that the specific mechanism in cigarettes that caused lung cancer was still unknown, but it was misleading, because the cause and effect had been proven.

In the late 1950's, Philip Morris and other tobacco companies formed another trade organization, the Tobacco Institute, to speak on their behalf. The Tobacco Institute issued press releases, such as the 1961 "Tobacco Institute Statement," which asserted, among other things, "The repetition by Dr. Wynder of his firm opinions does not alter the fact that the cause or causes of lung cancer continue to be unknown and are the subject of continuing extensive scientific research by many agencies." And a 1962 press release sent to CBS protesting a program on youth smoking stated, "causes of lung cancer are still unknown."

The statements were false. In 1961, there were a few other established causes of lung cancer, such as asbestos, but the affected industries were taking precautions to protect people from exposure. Ninety percent of lung cancers were shown to be caused by tobacco. There was no cancer researcher at that time who would say that the causes of lung cancer continued to be unknown.

In 1965, the Tobacco Institute issued a press release based upon the "genetic theory" of well-known statistician Ronald Fisher, who opined that there was a genetic factor that caused people to want to smoke and that made them susceptible to lung cancer. That theory had been repudiated in studies in the 1950's in Sweden, the United States, and Finland. The press release also referred to the "smoking theory" of lung cancer, even though no serious scientific researcher considered it a legitimate scientific concept in 1965. The United States Surgeon General had already reported the link in 1964.

In the 1950's, the major cigarette companies, including Philip Morris, entered into a "gentlemen's agreement" not to present products they marketed as "tested for safety," or to use test results to compete, such as by claiming that one company's cigarette has produced less cancer in rats, and not to do animal testing with regard to cancer. The agreement was in place throughout the 1960's.[8]

In the 1960's, Congress conducted hearings prior to enacting the Public Health Cigarette Smoking Act of 1969. (E.g., 15 U.S.C. § 1331 et seq.)[9] In March 1965, the Tobacco Institute issued a press release in which it described, among other things, the testimony of R.J. Reynolds president Bowman Gray before Congress on behalf of cigarette manufacturers, including Philip Morris, in opposition to the proposed legislation. Gray told Congress that many scientists held the opinion that it had not been established that smoking caused lung cancer or any other disease; that there was a very high degree of uncertainty; and that a great deal more research was necessary before definitive answers could be given.

By the 1950's, tar was and still is thought to contain most of the organic materials that are likely to cause cancer. When cigarettes were unfiltered and contained large particulate matter, they were irritating, which kept smokers from inhaling deeply. The growing use of filtered cigarettes in the 1960's reduced the amount of delivered tar from about 35 to 25 milligrams, and was thought to reduce the risk somewhat, but filters and flavorings, which act as bronchodilators, made cigarettes easier to smoke. The benefits came in the 1950's and 1960's, which saw a reduction from the 35 milligrams in the 1930's, to 25 milligrams. But there has been no benefit from a further lowering of tar beginning in the 1980's to 10 or 15 milligrams. And further reduction of tar in the so-called low-tar or "light" cigarettes has not resulted in a safer cigarette. It has affected only the *location* of lung cancers and the type of cancer that may be contracted.

It has been generally known since the late 1800's that it is difficult to quit smoking. Scientists have known that nicotine is addictive since the 1920's,

---

[8] In prior testimony read to the jury, Dr. Jan Uydess established that Philip Morris set up a laboratory in Germany to conduct health-related studies, such as on emphysema and toxicity, and effects on animal systems. Philip Morris did not do the research in the United States, because issues relating smoking to health and addictiveness were considered to be very sensitive. The reports from the German lab were sent to senior Philip Morris scientist T.S. Osdene at his home, and he would destroy them after reading them.

[9] We shall hereinafter refer to this statute either as the Public Health Cigarette Smoking Act of 1969 or simply as the 1969 Act. The 1969 Act required a health warning on every package of cigarettes sold in the United States. (15 U.S.C. § 1333; see generally *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 515–518, 525 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*), discussed within.)

although the how and the why came later. At the time of the first Surgeon General's report in 1964, however, many thought that in order to be truly addictive, a substance had to be intoxicating, to have a severe withdrawal syndrome, and to be associated with antisocial behavior, such as criminality. The 1964 Surgeon General's report defined drug addiction as "a state of periodic or chronic intoxication produced by the repeated consumption of a drug." Since tobacco was extremely difficult to quit, but was not intoxicating and did not involve antisocial behavior, the Surgeon General used the term "habituation."

In 1965, the World Health Organization discarded the term "habituation" in favor of "dependence," which encompassed addiction, and "addiction" and "dependence" were generally used interchangeably after that to mean any compulsive drug use. *Dependence* was defined as giving the use of a substance a higher priority than other things important to the user, like money or health. The intoxication element became obsolete, and *habituation* fell into disuse. By 1988, the Surgeon General's report dropped *addiction*, whether to intoxicating drugs or nicotine, in favor of *dependence*. But the tobacco companies continued urging obsolete terminology through misleading statements to the public, according to Benowitz.

Internal memoranda demonstrate that as early as 1959, Philip Morris recognized that "[o]ne of the main reasons people smoke is to experience the physiological effects of nicotine on the human system"; and that Philip Morris researchers knew no later than 1959 that addiction was a probable reason why people smoked. A 1969 memorandum shows that Philip Morris's scientists recognized that nicotine was a drug, but feared regulation by the Food and Drug Administration should this knowledge become public.[10]

Dr. William Farone, who testified for Boeken, was hired in the mid-1970's by Philip Morris for his expertise in colloid chemistry, which relates to aerosols, such as smoke. It was commonly understood among the Philip Morris scientists at the time he arrived at its laboratory in 1976 that nicotine was addictive. On several occasions, Dr. Osdene described his mission as one to "maintain the controversy," which Farone understood to mean creating doubt whether nicotine was addictive and whether smoking caused disease.

---

[10] Philip Morris attorneys were concerned that research amounting to tacit acknowledgement that nicotine was a drug would be "untimely" because of a legislative effort to transfer authority over tobacco to the FDA. In a 1980 internal memorandum, Robert B. Seligman, Osdene's successor as vice-president of research and technology, suggested that Philip Morris continue to study the "drug nicotine" to stay abreast of developments with an active research program, but cautioned, "we must not be visible about it," since the attorneys would "likely continue to insist upon a clandestine effort."

An internal memorandum shows that by 1972, Philip Morris recognized that the more nicotine a cigarette delivered, the greater its market. By then, the Marlboro brand was outselling the popular brands of earlier years.[11] A competitor, R.J. Reynolds, conducted a study to determine why, and found that the pH of Marlboro smoke was much higher than that of the smoke from any of its brands. The higher the pH in cigarette smoke, the more free-base nicotine is delivered to the smoker. Ammonia raises the pH level, and occurs naturally in tobacco. But Philip Morris added urea to Marlboro tobacco to increase the release of ammonia into the smoke.

In 1977, when Philip Morris scientist Carolyn Levy began to study the effects of nicotine withdrawal, her supervisor, W.L. Dunn, suggested to Osdene that he should "bury" any results, should they show similarities to morphine and caffeine. According to Farone, in 1984 Philip Morris shut down some of its research programs in order to eliminate research that could show that cigarettes were addictive or that could prove that they cause cancer. Senior management no longer wanted to do research that could be used against Philip Morris.

Paul Mele, Boeken's expert in behavior pharmacology, with additional training in the area of drug abuse, testified that he was employed by Philip Morris from 1981–1984. Philip Morris employed him to work in its secret laboratory where rat studies were conducted in an attempt to identify a nicotine substitute that would eliminate the adverse cardiovascular effects, but still keep people smoking.

A nicotine substitute would have to bind in the same area of the brain and produce the same effects on brain tissue, but Mele and his coworkers were told never to use the words, "drug" or "addiction."[12] Thus, they euphemistically concluded that rats "will work for" nicotine in the same way that they will work for cocaine or heroin. But the question of addiction or dependence was never in doubt, and their research goal was not to prove or disprove addiction, but to find compounds that would substitute for nicotine, in case nicotine were ever banned.

Dr. Mele wanted to publish a paper on nicotine tolerance during the time he worked for Philip Morris but his superiors would not permit it. He was told the research demonstrated that nicotine was a "dependence producing substance" within the definition of the Diagnostic and Statistical Manual of the American Psychiatric Association, and that it would not be acceptable to the company to have this known by the public. During this period, he heard a

---

[11] Marlboro is still the best selling brand in this country.

[12] The term *cancer* was not to be used either; they referred to it as "biological activity."

Philip Morris officer, Jim Remmington, say, "We all know it is addicting, it's addicting as hell. And our real concern is stopping these anti-smoking people outside the gates."

With this evidence in mind, we now turn to a discussion of the issues raised on appeal. We will include further evidence from the record relevant to the specific issues addressed.

## DISCUSSION

### 1. *Boeken's Reliance*

Philip Morris contends there is insufficient evidence to support a finding of reliance by Boeken on any false statements or nondisclosures to support the jury's verdict on fraud. In particular, Philip Morris contends that the evidence was insufficient to prove that Boeken was aware of *specific* misrepresentations and that he acted upon those specific misrepresentations, citing *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568] (*Mirkin*);[13] that the evidence was insufficient to establish a duty to disclose the concealed information; and that any reliance by Boeken was unreasonable and therefore unjustifiable as a matter of law. But before we address these three specific arguments, we need to address the factual presentation by Philip Morris in its briefing to this court.

The jury found against Philip Morris on the fraud claims of intentional misrepresentation, concealment, false promise, and negligent misrepresentation. Philip Morris challenges only the evidence of its duty to disclose and of Boeken's reliance, not the evidence establishing that it made misrepresentations, made misleading statements and concealed the facts that would have clarified them, or that it made a false promise, all with an intent to defraud. Indeed, claiming such evidence is irrelevant to the argument regarding Boeken's reliance, Philip Morris does not summarize most of the large volume of evidence showing that it was aware of the health hazards and addictive nature of its tobacco products, or that it undertook a campaign to disseminate falsehoods about smoking and health, and to conceal the truth from the public, including Marlboro smokers such as Boeken, in order to mislead them into believing that their cigarettes were safe and not addictive.

---

[13] In *Mirkin*, the Supreme Court reaffirmed the California rule that a fraud cause of action requires proof of actual reliance, and rejected a fraud-on-the-market theory of reliance advocated by plaintiffs who could not plead or prove that they heard or read any of the alleged misrepresentations, whether directly or indirectly. (*Mirkin, supra*, 5 Cal.4th at pp. 1088–1092.)

■ " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) The judgment is presumed to be correct. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) And we presume that the record contains evidence to sustain every finding of fact. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.) It is the appellant's burden to demonstrate that it does not. (*Ibid.*)

■ In furtherance of its burden, the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.) Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record. [Citation.]" (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 [130 Cal.Rptr.2d 436].)

The record in this case is very complex. The testimony heard by the jury spans 25 of the 40 volumes of reporter's transcripts. There are also 75 volumes of clerk's transcripts in the record. Boeken has provided copies of approximately 40 exhibits admitted at trial, but it appears that there were hundreds more shown to the jury that have not been transmitted to this court. In addition, portions of Boeken's videotaped deposition were played for the jury, and the parties have lodged a redacted transcript of the deposition, containing what appears to be 300 pages. Videotaped interviews of two other witnesses were lodged at our request, and were not transcribed.

Nevertheless, Philip Morris provided only the briefest summary of the trial evidence, and summarized only those facts which support its theories. Almost all of Philip Morris's factual summary consists of evidence favorable to its position—evidence showing that the dangers of smoking were well known by the public in the 1950's and 1960's, and other evidence from which a jury could reasonably infer that Boeken understood the health risks of smoking.

■ Even if Philip Morris were to show that the inferences it wishes us to draw are reasonable, we would have no power to reject the contrary inferences drawn by the jury, if they are reasonable as well. (*Crawford v. Southern Pacific Co., supra,* 3 Cal.2d at p. 429.) And a recitation solely of Philip Morris's own evidence is not a fair summary for purposes of determining whether any inferences drawn by the jury are reasonable and supported by substantial evidence. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.)

The issue of reliance is inextricably intertwined with the nature of the misrepresentations or concealments attributed to Philip Morris. To expect us to address the issue of reliance without reference to all of the evidence presented at trial regarding the misrepresentations and concealments is, at best, naive. At worst, it is an attempt to deceive.

In lieu of tendering all of the evidence, Philip Morris suggests that Boeken's counsel, Mr. Piuze, conceded the absence of evidence of reliance and causation during argument on posttrial motions when he answered "No" to the following question by the court: "The question is, can the plaintiff point to a single statement made by Philip Morris that ultimately reached Mr. Boeken that can be traced backward through a definite causal link back to Philip Morris?" But the discussion of the matter did not end with that negative response. Piuze went on to explain to the court that the issue of reliance had been proven by *circumstantial* evidence, which demonstrates the importance of a thorough presentation of all of the evidence.

██ "The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964].) Reliance " 'may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of [reliance] than . . . direct testimony to the same effect.' [Citations.]" (*Id.* at p. 814.)

We conclude that there was no concession by Mr. Piuze. While we could deem the failure of Philip Morris to set out the facts in the light most favorable to the judgment a forfeiture of the issue (*Foreman & Clark Corp. v. Fallon, supra*, 3 Cal.3d at p. 881), we have elected not to do so and we have thoroughly reviewed the record. Our independent review has revealed sufficient evidence to support the judgment, as we discuss in the next sections.

### A. *Substantial Evidence Supports Duty and Actual Reliance*

Philip Morris contends that the evidence was insufficient to establish a duty to disclose information that it fraudulently concealed. At the same time, however, Philip Morris concedes that a duty to speak may arise when necessary to clarify misleading "half-truths." (See *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1082–1083 [60 Cal.Rptr.2d 263, 929 P.2d 582].) But, Philip Morris contends, no duty arises where the plaintiff has not been misled by the half-truths.

 Philip Morris confuses the elements of duty and reliance. The duty arises upon the utterances of the half-truths; whether the plaintiff was misled is a question of reliance. (Cf. *Randi W. v. Muroc Joint Unified School Dist.*, *supra*, 14 Cal.4th at p. 1084.) Since Philip Morris does not challenge the evidence of its half-truths, we turn to its contentions with regard to reliance.

Relying on *Mirkin*, *supra*, 5 Cal.4th 1082, Philip Morris suggests that in order to show reliance, Boeken was required to prove that the false or misleading representations were made directly to him and that such proof must include the exact words of the false or misleading representation upon which he relied. We find no such requirements in *Mirkin*.

 As stated in *Mirkin*, Restatement Second of Torts section 533 provides: " 'The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved.' " (*Mirkin*, *supra*, 5 Cal.4th at p. 1095.)

We first review the evidence particular to Boeken in connection with an argument that Boeken's fraud claim cannot stand because he could not recall a particular advertisement that made him decide to smoke.

Even before Boeken became a target member of the group of addicted smokers, Philip Morris targeted Boeken as a member of another group— adolescent boys. Until 1955, Marlboro was marketed primarily to women smokers. At that time, Philip Morris began to reposition the brand as masculine. From the mid to late 1950's, its ads featured a handsome, virile, tough and independent-looking young man with a tattoo, looking as though he could be a dashing movie star, a detective, a sailor, or a cowboy—the "Marlboro man."

Marvin Goldberg, Ph.D., Boeken's marketing, advertising, and consumer behavior expert, explained how such advertising exerts a particularly powerful influence upon adolescent boys. He concluded from a review of Philip Morris's advertisements that they were intended to target young males from 10 to 18 years old, beginning in 1955. And, in Goldberg's opinion, the ads were aimed at young male "starters," first-time smokers.

Goldberg testified that child development literature suggests that young male adolescents are just developing their self-concept, and that they are very self-conscious. They feel that others are equally conscious of them, and want

to appear to be mature, strong, independent, and masculine. If they see that a self-confidant, virile, and handsome man is smoking a certain brand of cigarette, they are likely to conclude that if they smoke that brand, they will look less fragile and vulnerable than they really are. And when their peers do the same, the cigarette brand acts as a badge and a magnet.

Philip Morris advertised on popular family television shows in the 1950's and 1960's, such as *I Love Lucy*, the most popular show in 1955. Other popular prime-time shows on which it advertised were *Red Skelton* and *Jackie Gleason*, both comedy shows, *Rawhide*, a western, *Perry Mason*, a detective show, *Route 66*, an adventure drama, *Alfred Hitchcock* and *East Side West Side*, suspense and mystery shows. *Rawhide* and *Route 66* involved characters similar to the masculine images in the ads of that period.

Television advertising has been shown to be very effective, particularly with children. And more than 30 percent of the audience for such shows as *Red Skelton* and *Jackie Gleason* consisted of children, well above the percentage of children in the population.

Goldberg testified that Boeken's inability to recall being influenced by any particular advertisement does not mean that it was not a cause of his smoking. Goldberg described the various media for advertising, and explained that the average person receives about 1000 advertising messages per day, too many for most people to process, so most are perceived in glimpses, making repetition an important feature in advertising. Thus, even if advertising images remain in the background, and are perceived only in glimpses, repetition causes them to become familiar, creating associations in the minds of people who do not think them through. This results in "associative learning," and those influenced by it are unlikely to be aware of it.

Associative learning is particularly effective with children. The Surgeon General's reports of 1994 and 1996 concluded that advertising encourages youth smoking. Studies have shown that the more children are exposed to cigarette advertising, the more they overestimate the number of smokers, and are persuaded that smoking is the norm. Such a belief among children is one of the highest risk factors for youthful smoking. They smoke because "it's the thing to do."

And, as the Supreme Court recognized in *Mirkin*, as well as prior to *Mirkin*, " '[c]hildren in particular are unlikely to recall the specific advertisements which led them to desire a product . . . .' [Citation.]" (*Mirkin, supra*, 5 Cal.4th at p. 1099, quoting *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 219 [197 Cal.Rptr. 783, 673 P.2d

660].) Boeken's testimony bears this out. Boeken started smoking at the age of 10, occasionally sneaking butts from ashtrays. At the age of 12, he made play cigarettes from gum sticks, rolling them lengthwise. When he was 13 years old, he began to smoke whole, real cigarettes. He did it because "everybody smoked. All adults smoked. It was fashionable. It was sophisticated. It was cool. It was adult. . . . Sports figures smoked. Race car drivers smoked. Everybody smoked. . . . All the kids smoked." Boeken wanted to be grown up. He was at "that age," and that was "the thing to do."

He wanted to smoke even though it was not pleasurable at first—it caused him to feel dizzy, faint, and to cough, and he had to "train" himself to inhale. At first, he smoked whatever brand he could get his hands on, and then he discovered vending machines, which allowed him to pick the brand he wanted. He used the vending machines in the coffee shops across from his junior high and high schools, where a pack of cigarettes cost only 25 cents and no one interfered.

With the discovery of vending machines, Boeken was able to buy a particular brand, and he chose Marlboros, because "[t]hey were everywhere. They advertised everywhere." It was the cigarette of choice in his social set, his culture, and all his friends smoked Marlboros. Marlboro ads seemed to be everywhere—at baseball games, sporting events, racing events, and on racing cars. Boeken testified, "I was visually inundated with this brand of cigarette." And he was "impressed by the ads," although he could not recall anything about any particular ads between 1957 and 1960. And no particular advertisement came to mind as a factor in his decision to smoke.

To Boeken, Marlboros represented a very macho, sophisticated, hip way of smoking. He perceived a message that it was the one and only cigarette to smoke. Boeken remembered the 1950's and 1960's as the age of Playboy magazine, sophistication, machismo, and doing manly things, like smoking cigarettes.

In that era, Boeken thought of himself as a "real guy." At the time of his testimony, Boeken picked out several advertisements from the 1960's that looked familiar to him. He remembered the "Marlboro country" ads, and the slogan, "Come to where the flavor is." Boeken also remembered billboards showing the "Marlboro man" with his lasso, and another with a healthy-looking model in great shape jumping over a fence with one hand. Boeken thought that the healthy and robust images in the cowboy ads implied that Marlboros were good for you.

He thought the Marlboro man was a "man's man," like his hero, John Wayne. Boeken rode a motorcycle—his equivalent of John Wayne's horse, and in 1966, at age 21, he rode around Europe on his motorcycle.

Over the years, another brand's ad campaign occasionally caught Boeken's attention, and he tried it for a few days, but always returned to Marlboros, although he was not sure exactly why. He knew he liked the taste better than other cigarettes—they were smoother, yet stronger.

Thus, Boeken started smoking Marlboros as a child for reasons that track Philip Morris's advertising of the time, and he remembered their themes with fair certainty, as well as how they enticed him to smoke with false images of health, sophistication, and machismo.

■ "Substantial evidence means such evidence as a reasonable fact trier might accept as adequate to support a conclusion; evidence which has ponderable legal significance, which is reasonable in nature, credible and of solid value. [Citations.]" (*Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 142 [126 Cal.Rptr. 690].) We conclude that the foregoing evidence supports the jury's conclusion that Boeken relied upon advertising by Philip Morris.

We turn now to evidence of Boeken's reliance on the so-called false controversy.

Boeken started smoking at the age of 10, occasionally sneaking butts from ashtrays. By the time he was 14 years old in 1957, Boeken was smoking two packs a day, and even more as he got older. By the time he was 15 or 16, Boeken had begun to suffer his first bouts of bronchitis. The doctor gave him antibiotics, but did not tell him to quit smoking. Although his high school swim coach told him not to smoke because it would affect his "wind," meaning endurance, no other teacher told him not to smoke. Most of the teachers smoked as well. Boeken's mother allowed him to smoke openly at home. She smoked two packs a day herself, and never told him of the dangers of smoking.

Boeken suffered more bouts of bronchitis in his 20's, and by his 30's, he suffered two or three each winter. They were always treated with antibiotics, and no doctor ever told Boeken that they were caused by smoking. Many doctors also smoked at that time. Boeken began to suspect in the mid-70's that smoking bore some relationship to his bronchitis, but he was unable to stop or even cut down on the number of cigarettes he smoked while he was ill, even when it hurt to inhale.

The Surgeon General warnings went on cigarette packs in the mid to late 1960's. Boeken thought that the warnings were "political more than anything else," and that they were required by the government pursuant to some personal vendetta of the Surgeon General. He did not even read the Surgeon

General's warning until after he filed this action. Boeken explained, "I believed the cigarette advertisements. . . . I didn't think there was anything wrong. . . . I believed they were good for you. I believed everybody smoked them. You're back in the 60's, right? . . . . I didn't believe they were unhealthy."

But Boeken was aware of what he described as a "controversy." He testified that in the 1960's, he heard that the cigarette companies had refuted the fact that cigarettes were addictive, dangerous, harmful, or cancer-causing, and he was aware of a "conflict" over the Surgeon General's warnings. And he relied upon the refutations by the tobacco industry. It was only much later that Boeken discovered there was no *real* controversy. He testified that if Philip Morris had made the real risk of lung cancer and death clear to him in the 1960's, when Philip Morris was instead creating a false controversy with regard to the Surgeon General's report, he would have quit smoking.

In the 1970's, Boeken heard through various news media that tobacco companies claimed that there was no proof or scientific fact that smoking caused cancer, emphysema, or any other lung or blood disease. He trusted them, and believed the harm was being overstated by others. Other than advertisements, however, he could not recall particular statements made by tobacco companies until much later, when tobacco executives falsely testified before Congress in 1994.

By the 1970's, he knew that cigarettes were addictive, and that he was addicted, but he believed the statements by the industry that there was no health risk. The first time that Boeken knew that smoking could cause a catastrophic illness was around 1976, when he had his gallbladder removed, and the doctor told him he could get emphysema. He consulted another doctor, who said, "Forget it. You don't have emphysema. He was playing with you."

Boeken tried to stop smoking several times over the years. The first time was in 1967, when his girlfriend gave him an ultimatum. He did not want to lose her, so he stopped; but three or four weeks later, he started again, and she left him.

Boeken tried to quit again in 1976, at the beginning of what he termed "the health craze," when jogging became popular. He wanted to jog too and he started lifting weights, but he felt he needed stronger "wind." He was unable to stop smoking, however, due to withdrawal and cravings. His withdrawal symptoms consisted of a bad attitude, nastiness, anger, and a huge appetite. He became edgy and snappy, with inappropriate angry reactions.

In 1980, Boeken tried hypnosis to quit. He succeeded for 30 or 40 days, the longest time ever, but he was a "nervous wreck." His first relapse, a cigarette smoked with a cup of coffee, felt like "the best thing that ever happened" to him. In 1982, Boeken attended a SmokEnders course for three or four weeks, attending three or four times a week. And in 1986 or 1987, he joined Smokers Anonymous, a 12-step program. He was motivated to quit by more frequent bouts of bronchitis, as well as a continuing desire to run, but he claimed that he still did not know that smoking caused lung cancer. Boeken tried Nicorette gum on more than one occasion, and patches, sometimes both at the same time, but he failed to quit.

After a three-month heroin addiction in the late 1960's, Boeken entered a methadone maintenance program, and quit methadone within three years. In the mid-70's, Boeken went to Alcoholics Anonymous and stopped drinking in nine months. But he has never been successful at quitting smoking.

In 1981 or 1982, thinking it would lessen his bronchitis, Boeken switched to Marlboro "Lights," because they were lower in tar and nicotine, and "milder." As soon as Philip Morris began to market Marlboro "Ultralights," he switched to those.

On the news in 1994, Boeken saw portions of the testimony of tobacco company executives before Congress. They all denied that tobacco was addictive or harmful. They all denied under oath that it caused cancer. He knew they were lying, but at the time, he still believed them, because he did not think they would lie to the government under oath. Also in 1994, Boeken's mother, who smoked two packs a day until her death, died of lung cancer, and he had no more doubts about whether smoking caused cancer. It was much later that he learned for the first time that accelerants, additives, or chemicals were added to the tobacco in his cigarettes, in order to increase their addictiveness.

Even then, Boeken was still unable to quit. In October 1999 he was diagnosed with lung cancer and underwent extremely painful surgery to remove the upper part of a lung, and then he began chemotherapy. By that time, however, the cancer had spread to his lymph nodes, and his chance of surviving the disease was less than one percent. Within a year, the cancer had spread to his brain, and there was no chance of survival.

Boeken stopped smoking just before the surgery to remove part of his lung, but started taking an occasional puff or two after the first round of chemotherapy was over, because it calmed him. But he was shattered when he was diagnosed with brain cancer, and felt he needed more, so he bought a pack of Marlboro "Reds", and was soon smoking two or three packs a day.

Boeken testified that if Philip Morris had made it clear to him in the 1960's, the 1970's, or even the 1980's, that cigarettes cause lung cancer and death, he would not have smoked. At least, he *thought* he would have made an "honest effort" to quit. He also felt that if Philip Morris had admitted in the 1960's or 1970's, not only that smoking caused lung cancer but also that Philip Morris added ingredients to Marlboro cigarettes in order to increase their addictiveness, he would have stopped smoking Marlboros.

The record supports the conclusion of the jury that Boeken, an addicted smoker, was a target of Philip Morris's misrepresentations and that he actually relied upon its campaign of doubt.

### B. *Substantial Evidence Supports a Finding of Justifiable Reliance*

Philip Morris contends that Boeken's reliance upon its fraud was unreasonable and therefore, it suggests, unjustifiable as a matter of law. In support of this contention, Philip Morris relies in part upon Ohio law, as interpreted by a federal trial court in an unpublished memorandum opinion, *Glassner v. R.J. Reynolds Tobacco Co.* (N.D. Ohio Jun. 29, 1999, No. 5:99 CV 0796) 1999 WL 33591006. Philip Morris claims that the federal court of appeals, in *Glassner v. R.J. Reynolds Tobacco Co.* (6th Cir. 2000) 223 F.3d 343, affirmed the trial court's ruling that as a matter of law, evidence of common knowledge of the dangers of smoking *requires* a finding that reliance on the tobacco companies' fraud is unjustifiable. Philip Morris misreads the appellate opinion. While the appellate court affirmed the judgment, it expressly disagreed with the district court's ruling on justifiable reliance. (See *id.* at p. 353.)

Philip Morris also relies upon Massachusetts law, as interpreted by a federal trial court. (E.g., *Massachusetts Lab. Health & Wel. v. Philip Morris* (D.Mass. 1999) 62 F.Supp.2d 236, 244.) That court held that the facts alleged in the complaint filed by a union trust fund did not amount to justifiable reliance as a matter of law, but applied the same objective standard of reasonableness to both intentional misrepresentations and negligent misrepresentations. (See *ibid.*)

Under California law, which controls in this case, whether reliance was reasonable is a question of *fact* for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601].) Further, under California law, whether reliance is reasonable in an *intentional* fraud case is not tested against the "standard of precaution or of minimum knowledge of a hypothetical, reasonable man." (*Seeger v. Odell* (1941) 18 Cal.2d 409, 415 [115 P.2d 977].)

"Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. [Citations.] 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' [Citation.] If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery. [Citations.] 'He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth. . . .' [Citation.]" (*Seeger v. Odell, supra,* 18 Cal.2d at p. 415.)

As we have discussed, it is presumed that the evidence is sufficient to support the jury's factual findings, and it is the appellant's burden to demonstrate that it does not. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.) And in furtherance of that burden, the appellant must fairly summarize the facts in the light favorable to the judgment. (*Ibid.*) We have previously noted that Philip Morris failed to do so, which results in a forfeiture of the contention. (See *ibid.*)

Notwithstanding the forfeiture, substantial evidence supports a finding that Boeken's reliance was justifiable. The evidence supports the conclusion that Philip Morris knew in the late 1950's, when Richard Boeken started smoking, that cigarettes caused lung cancer. Further, it is reasonable to infer that it also knew by that time, or at least well before 1969, that nicotine was addictive, and that the more nicotine its cigarettes could deliver, the more quickly a smoker would become addicted. Understanding the danger of this information, Philip Morris set up its campaign of deception. Boeken testified that his belief in the tobacco companies, rather than the Surgeon General, was wishful thinking or naivete. But he had believed in the honesty of "big business." Further, Philip Morris had studied and understood nicotine addiction, and from the facts we have previously summarized, it is reasonable to infer that the jury concluded it knew and intended that addicted smokers would reasonably use its misrepresentations and misleading statements to engage in denial and rationalization; and, moreover, that smokers' ignorance of the increased addictiveness of Philip Morris's Marlboro brand would keep them smoking Marlboros and ensure their reliance upon such denial and rationalization.

### 2. *Product Liability*

Philip Morris contends that Boeken failed to prove the elements of product liability, because "[a] defendant . . . may not be held liable for selling a legal product merely because that product is inherently dangerous," without "showing either (1) that the product was improperly designed or manufactured; or

(2) that the product lacked appropriate warnings." The problem with this argument is that it does not address all theories of product liability presented to the jury. Thus, even were we to agree with Philip Morris in this argument, the verdict may be affirmed on the basis of the consumer expectations test.[14]

■ Although denominated "special verdict," the verdict was a general one, since it contained no findings of fact. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347, fn. 7 [100 Cal.Rptr.2d 446]; Code Civ. Proc., §§ 624, 625.) " '[W]here several issues in a cause are tried and submitted to a jury for its determination, a general verdict may not be disturbed for uncertainty, if one issue is sustained by the evidence and is unaffected by error. [Citations.] When a situation of this character is presented it is a matter of no importance that the evidence may have been insufficient to sustain a verdict in favor of the successful party on the other issues or that reversible errors were committed with regard to such issues.' [Citation.]" (*Mouchette v. Board of Education* (1990) 217 Cal.App.3d 303, 315 [266 Cal.Rptr. 1], disapproved on another ground in *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 984, fn. 6 [42 Cal.Rptr.2d 842, 897 P.2d 1320]; see also *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673 [117 Cal.Rptr. 1, 527 P.2d 353].)

■ Substantial evidence supports a finding that Marlboro Lights were a defective product under the consumer expectations test. The consumer expectations test is satisfied when the evidence shows that "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 [143 Cal.Rptr. 225, 573 P.2d 443].) Some degree of misuse and abuse of the product is foreseeable. (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833 [20 Cal.Rptr.2d 296].)

Dr. Benowitz testified that Marlboro "Lights" and "Ultralights" are not light at all, since they deliver more than 0.1 milligram nicotine and more than 1 milligram tar per cigarette to human smokers who compensate. Compensation occurs when the smoker adjusts the way he or she smokes in order to get a satisfying amount of nicotine, by covering the holes in the filter, sucking harder, drawing the smoke further into the lungs, and keeping it in longer. Benowitz testified that studies have shown that most smokers believe that light cigarettes are safer than regular cigarettes, and the majority of smokers do not know that they compensate. Compensation by smokers draws carcinogens further into the lungs, which is more likely to cause adenocarcinoma of the lung, a more aggressive form of cancer than those more prevalent among smokers of regular-strength cigarettes.

---

[14] Additionally, in light of the fact we have found substantial evidence supports the fraud count, that is sufficient to support the verdict.

■ Philip Morris suggests that the consumer expectations test is, in essence, one for failure to warn, and therefore preempted by the Public Health Cigarette Smoking Act of 1969.[15] Again, we disagree. Product liability under a failure-to-warn theory is a distinct cause of action from one under the consumer expectation test. (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 717 [110 Cal.Rptr.2d 722].)[16]

We turn to Philip Morris's claims of instructional error.

### 3. *Civil Code Section 1714.45*

Philip Morris contends that Boeken was not entitled to a finding of product liability, whether measured under the "risk-benefit" test or the "consumer expectations" test, and that the trial court erred in instructing with BAJI No. 9.00.5 instead of 9.00.6.[17]

BAJI No. 9.00.6 is derived from the former version of Civil Code section 1714.45, which provided cigarette manufacturers with immunity from product liability actions.[18] (Stats. 1987, ch. 1498, § 3, p. 5778; see *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 837 [123 Cal.Rptr.2d 40, 50 P.3d 751] (*Myers*).) The statute was originally passed in 1987 and, as pertinent, provided: "(a) In a product liability action, a manufacturer or seller shall not be liable if: [¶] (1) The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community; and [¶] (2) The product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, *tobacco*, and butter, as identified in comment i to Section 402A of the Restatement (Second) of Torts." (Stats. 1987, ch. 1498, §3, p. 5778, italics added.)

Thus, as originally enacted in 1987, the statute's enumerated examples of common consumer products included tobacco. (See Stats. 1987, ch. 1498, § 3, p. 5778; *Naegele v. R.J. Reynolds Tobacco Co.* (2002) 28 Cal.4th 856, 860–862 [123 Cal.Rptr.2d 61, 50 P.3d 769] (*Naegele*).) It was based upon the

---

[15] See a more detailed discussion of the 1969 Act, within.

[16] Since smokers do not know they compensate, a warning may not make the product any safer. Philip Morris's own expert, Dr. Richard Carchmann, admitted that the only way to reduce the risk is to quit smoking.

[17] BAJI No. 9.00.6 reads: "The (manufacturer or seller) of a product is not liable for [injuries] [death] caused by a defect in its design, which existed when the product left the possession of the (manufacturer or seller), if: [¶] 1. The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer, who has the ordinary knowledge common to the community, and who consumes the product; and [¶] 2. The product is a common consumer product intended for personal consumption."

[18] We shall hereinafter refer to the statute as section 1714.45 or "the immunity statute."

position taken in comment i of section 402A of the Restatement Second of Torts that " 'a manufacturer or seller *breaches no legal duty* to voluntary consumers by merely supplying, *in an unadulterated form*, a common commodity which cannot be made safer, but which the public desires to buy and ingest despite general understanding of its inherent dangers.' [Citation.]" (*Naegele, supra,* 28 Cal.4th at p. 864, second italics added.)

In 1997, the Legislature amended section 1714.45 to rescind the statutory immunity for tobacco companies as of January 1, 1998. (Stats. 1997, ch. 570, § 1; see *Myers, supra,* 28 Cal.4th at pp. 832–833, 837.) Thus, "while the Immunity Statute was in effect—from January 1, 1988, through December 31, 1997—no tortious liability attached to a tobacco company's production and distribution of pure *and unadulterated* tobacco products to smokers. [Citations.]" (*Myers, supra,* at p. 840, italics added.)

 The statute was expressly retroactive, and while it was in effect, it immunized tobacco manufacturers from liability for conduct before, as well as during, the 10-year period. (*Myers, supra,* 28 Cal.4th at p. 847; *Souders v. Philip Morris Inc.* (2002) 104 Cal.App.4th 15, 24, fn. 7 [127 Cal.Rptr.2d 748].) Once it was repealed, however, the statute's retroactive effect was nullified, and tobacco companies were no longer immune to liability for conduct occurring prior to 1988.[19] (*Myers, supra,* 28 Cal.4th at p. 847.)

Neither *Myers* nor *Naegele* had been decided when Philip Morris filed its opening brief. In its opening brief, Philip Morris argued that repeal of the original section 1714.45 did not nullify its retroactivity, and that it retained immunity from liability that would otherwise have arisen not only prior to 1998, but also prior to the statute's passage in 1987. Before Philip Morris filed its reply brief, *Naegele* and *Myers* were published. *Myers* held that the immunity statute applied to tobacco only during the 10 years beginning January 1, 1988, and ending December 31, 1997. (*Myers, supra,* 28 Cal.4th at p. 837.) *Naegele* confirmed this and also held that the protection of the 10-year immunity statute did not "extend to allegations that tobacco companies, in the manufacture of cigarettes, used additives that exposed smokers to dangers beyond those commonly known to be associated with cigarette smoking." (*Naegele, supra,* 28 Cal.4th at p. 861.) Therefore, except for the limited 10-year period, Philip Morris was not entitled to have the jury instructed with BAJI No. 9.00.6. (See Comment to BAJI No. 9.00.6 (Jan. 2004); Stats. 1997, ch. 570, § 1.)

---

[19] In *Myers,* the Ninth Circuit Court of Appeals had certified the following question to the California Supreme Court: " 'Do the amendments to Cal. Civ. Code § 1714.45 that became effective on January 1, 1998, apply to a claim that accrued after January 1, 1998, but which is based on conduct that occurred prior to January 1, 1998?' " (*Myers, supra,* 28 Cal.4th at p. 839.)

Although Philip Morris addressed *Naegele* and *Myers* in its reply brief, we permitted it to file a supplemental opening brief. For the first time in its supplemental brief, Philip Morris claims that it requested and submitted a jury instruction that would have limited its liability for any wrongs committed during the 10-year immunity period, proposed special instruction lettered "O."

Philip Morris's packet of *proposed* jury instructions, filed on May 16, 2001, included that proposed instruction, which reads: "You may not find defendant liable on plaintiff's claims of design defect, negligence, fraud and conspiracy or failure to warn based on anything that defendant did or did not do between January 1, 1988, and December 31, 1997. It was the policy of California during that period to recognize cigarettes as inherently unsafe products that could nevertheless be lawfully sold because they carried adequate warnings regarding their dangers, and to encourage the continued availability of cigarettes and other tobacco products to those adult consumers who wished to use them. This was accomplished by a law that protected producers or suppliers of cigarettes or other tobacco products from legal responsibility for harms suffered by those who voluntarily consumed such products. That law was repealed as of January 1, 1998, and has no legal effect with respect to conduct since that date, and also has no legal effect with respect to plaintiff's claim for breach of express warranty."

The problem we have is that we have found no ruling by the trial court rejecting this instruction. The instruction conference was unreported. We did find a cover sheet signed by the trial judge, and file-stamped June 6, 2001, which is entitled "Instructions—Refused Withdrawn, Consisting of 10 pages herein." But the 10 pages are not attached, unless the cover sheet was meant to refer to the 10 pages attached to the document immediately following it in the clerk's transcript.

The document immediately following the trial court's cover sheet is entitled "Objections of Defendant Philip Morris Incorporated to Court's Rejection of Certain Jury Instructions Proposed by Defendant." The 10 pages that follow contain seven proposed instructions. Proposed instruction O is not among them.

We requested Philip Morris to provide us with the exact page numbers in the appellate record where the trial court's refusal to give its proposed instruction O might be found, or to augment the record with a copy of the trial court's minute order or additional reporter's transcript, if any, showing the refusal, or to inform this court if there was no such order or ruling. Rather than directly respond to our request, Philip Morris filed a letter brief suggesting that we must assume that the instruction was requested and

rejected, *because the record is silent* with regard to an express ruling, and the instruction conference was in chambers. As authority for its suggestion, Philip Morris states that it knows of no authority to the contrary. In fact, there is no shortage of authority to the contrary. It is well established that error cannot be presumed, and it is the appellant's burden to provide a record sufficient to show the asserted error. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932]; *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712 [152 Cal.Rptr. 65].)

Relying upon language in *Alexander v. Nextel Communications, Inc.* (1997) 52 Cal.App.4th 1376 [61 Cal.Rptr.2d 293], Philip Morris contends that we must assume that it requested and the court rejected the instruction, even absent a record of the ruling. In that case, we were satisfied that certain instructions were, in fact, requested but refused, although there was no discussion between court and counsel in the record. (See *id.* at p. 1379, fn. 3.) But we did not enunciate a rule that whenever the instruction conference is unrecorded, it must be assumed that a particular instruction has been requested and refused.

 Here, the evidence is that the instruction was in the *proposed* packet filed on May 16, 2001. But we cannot conclude Philip Morris actually requested that the court instruct the jury with it. Rather, the inference from the record is that for tactical reasons the instruction was either withdrawn or not proffered to the court by Philip Morris. This inference is consistent with the fact that instruction O was not attached to the "Objections of Defendant Philip Morris Incorporated to Court's Rejection of Certain Jury Instructions Proposed by Defendant." It is also consistent with the legal position asserted by Philip Morris at trial, and in its opening brief on appeal: that the statute immunized it from liability for all conduct prior to January 1, 1998, including all conduct preceding January 1, 1988, not just for the 10-year period the statute was in force. A party is not entitled to instructions with regard to a theory or defense that the party has *not advanced.* (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Philip Morris also filed a motion to augment the record, but not with an agreed or settled statement reflecting the in camera instruction conference or any ruling on the instructions. (See *Maria P. v. Riles, supra*, 43 Cal.3d at p. 1295; *In re Kathy P.* (1979) 25 Cal.3d 91, 102 [157 Cal.Rptr. 874, 599 P.2d 65]; Cal. Rules of Court, rules 6, 7, 12(a).) Instead, Philip Morris seeks to augment the record with the trial court's statement of decision regarding Philip Morris's pretrial motion for summary adjudication, in an attempt to show that requesting an instruction or a ruling on the proposed instruction would have been futile, because the trial court had already ruled against it on that issue. We grant the motion, because the statement of decision was part of

the trial court record. But we find the statement of decision consistent with our inference. It discloses the claim by Philip Morris of immunity for all pre-1998 conduct, not just conduct between 1988 and 1998.

■■■ We also note that instruction O was incomplete because it did not incorporate the term "unadulterated" within its language. Philip Morris argues that the omission was so minor as to require the trial court to modify the instruction. We disagree. "A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may . . . properly refuse it. [Citations.]" (*Truman v. Thomas* (1980) 27 Cal.3d 285, 301 [165 Cal.Rptr. 308, 611 P.2d 902].)

Philip Morris states in its reply brief that "there is no evidence that Philip Morris, during the 1960's or at any other time, was adding things to Marlboro cigarettes . . . for the purpose of addicting plaintiff or any other smoker." In fact, there is more than ample evidence in the record, as previously discussed, that Philip Morris incorporated additives that not only increased the risk of harm from nicotine, but also created harmful effects not inherent in smoking unadulterated tobacco.

The evidence also established, contrary to Philip Morris's assertions, that additives contributed to Boeken's lung cancer. By the age of 14, Boeken smoked every day, at least two packs a day, and continued for 40 years, unable to quit for more than a brief period even after he was diagnosed with lung cancer. According to Benowitz, Boeken was not just addicted to cigarettes, he was highly addicted. The increased ammonia had done its job of addicting more effectively and more quickly.

Further, Farone testified that 20 percent of the contents of a cigarette consists of added flavorings. Flavorings such as chocolate and licorice are not added simply to improve the taste, but also to make it easier to inhale the smoke by creating bronchodilators, which open up the lungs. Cigarettes that are easier to smoke allow carcinogens to reach deeper into the lungs, which can lead to adenocarcinoma, the very aggressive and fast-spreading cancer from which Boeken suffered.

Epidemiologist and oncologist Gary Strauss explained that when cigarettes are more irritating, people do not inhale deeply, and the central part of the lungs is the area primarily exposed to cancer-causing particulates. The more deadly adenocarcinomas, however, grow in the periphery, that is, the end of the lung, reached by deeper inhaling. The incidence of these cancers has increased in recent years and that increase is attributable to low-tar cigarettes.

We conclude that even if Philip Morris did not withdraw proposed instruction O, and the court did refuse to give the instruction, the court did not err.

### 4. *Federal Preemption Contentions*

Philip Morris contends that certain evidence, argument, and claims were preempted by the Public Health Cigarette Smoking Act of 1969, and that the trial court failed to instruct the jury properly "on this point." Its contentions are twofold: (1) the trial court erred by refusing to "instruct the jury, as Philip Morris requested, that it could not hold Philip Morris liable on the ground that its post-1969 advertising contained supposedly 'glamorous' and 'healthy' imagery"; and (2) that the trial court erroneously "admitted, over Philip Morris's objection, evidence that Philip Morris's advertising contained such imagery."

 The 1969 Act requires a particular warning, or a variation of it, to appear· in a conspicuous place on every package of cigarettes sold in the United States. (15 U.S.C. § 1333; see generally *Cipollone, supra,* 505 U.S. at pp. 515–518, 525.) It also explicitly reserves authority to the Federal Trade Commission to identify and punish deceptive advertising practices relating to smoking and health. (*Cipollone, supra,* at p. 529; 15 U.S.C. § 1336.) The United States Supreme Court has construed the 1969 Act as preempting damage claims based upon a failure-to-warn theory that requires a showing that post-1969 advertising or promotions should have included additional or more clearly stated warnings, or that its advertising tended to minimize or neutralize the health hazards associated with smoking. (*Cipollone, supra,* 505 U.S. at pp. 524, 527–528.)

We first address the second contention of Philip Morris: that the trial court erred in permitting Dr. Goldberg to testify at length and over its objection about preempted, post-1969 advertising. In that testimony, which took place on April 17, 2001, Goldberg referred to several exhibits which have not been made a part of the record on appeal. He described them as advertisements that demonstrate an intent to market Marlboro cigarettes to adolescent males, and to turn youthful nonsmokers into smokers.

 Philip Morris fails to identify a specific objection it made in connection with this testimony. A judgment may not be reversed unless the record shows that the appellant made a timely objection to or a motion to exclude or to strike the evidence and that the specific ground of the objection or motion was stated. (Evid. Code, § 353, subd. (a).)

Philip Morris contends that its objection was made in its motion in limine No. 1, which stated a general objection to any and all evidence that *might* relate to preempted advertising. Philip Morris's motion in limine did not, however, specify any particular evidence to be excluded, and did not mention the Goldberg testimony about which it now complains.

■ A motion in limine to exclude evidence is not a sufficient objection unless it was directed to a particular, identifiable body of evidence and was made at a time when the trial court could determine the evidentiary question in its appropriate context. (*People v. Morris* (1991) 53 Cal.3d 152, 188–190 [279 Cal.Rptr. 720, 807 P.2d 949], overruled on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) Thus, Philip Morris's motion in limine did not preserve the issue for appeal.

Philip Morris also contends that the court gave it a "running objection . . . to this whole area." The court allowed Philip Morris a "running objection" in a discussion which took place the day before the Goldberg testimony now in question, and although it does appear that the court may have been referring to evidence of preempted advertising, the discussion on that day was precipitated by Philip Morris's objection *on the ground of relevance* to testimony concerning the targeting of youthful smokers after Boeken became an adult. Philip Morris's counsel, Mr. Leiter, made it clear to the court that *he was not objecting to post-1969 youth-targeted advertising on the ground of federal preemption.*

On the day at issue, April 17, 2001, after Goldberg read an excerpt from an article about youth smoking, Leiter said, "Your Honor, may we have our standing objection," but he did not explain what standing objection he had in mind. The judge assented, apparently thinking that he understood to which objection counsel was referring, and he then took the matter up outside the jury's presence. The ensuing discussion began in relation to targeting youth smokers, and the court referred to a discussion of the subject the day before, April 16, 2001.

In the April 17 discussion, it was again the court that brought up the issue of preemption. Counsel for Boeken offered to stipulate to having the court strike the article from which Goldberg had read. Leiter responded that he would prefer a limiting instruction, either at that time or later in the trial, regarding the proper use of the testimony and warning against the improper use of it under *Cipollone*. The court agreed to give such an instruction once it had "an appropriately written jury instruction" before it. Leiter agreed, with the understanding that he continue to have "a standing objection to all such testimony." The court replied, "You do, you do," and ruled that the "current

information with the exception of erosion type suggestions" was relevant to an understanding of what occurred in the 1950's, when Boeken started smoking.

Thus, it appears that Philip Morris did not object to the Goldberg testimony regarding post-1969 advertisements, and whatever its vague "running" or "standing" objection was, it was not "directed to a particular, identifiable body of evidence," and therefore did not comply with Evidence Code section 353, subdivision (a). (*People v. Morris, supra*, 53 Cal.3d at pp. 188–190.) The testimony to which Philip Morris did object concerned an excerpt from an article regarding the targeting of youth smokers, and Philip Morris refused an offer to stipulate to the court's striking that testimony, agreeing instead upon a limiting instruction to be submitted in writing. Even if Philip Morris could bootstrap its objection to the reading of the article into an objection to the testimony that preceded it, it may not complain on appeal about the admission of evidence that it induced the court not to strike. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79].) We conclude that Philip Morris has not preserved the issue for appeal.[20]

We turn to Philip Morris's claim that it requested two instructions relating to federally preempted advertising, and that the trial court refused both requests. The first of the two instructions at issue was requested *orally* during the testimony of Boeken's expert on nicotine addiction, Benowitz. Philip Morris has summarized neither the testimony nor its discussion with the court, has not put its request for this instruction in context, and has not summarized the court's ruling, which was not simply a refusal to give a requested instruction, as we shall explain. We begin with a summary of the relevant portions of the record.

Philip Morris objected during Benowitz's testimony regarding the use of healthy, sexy, happy models in advertisements, and moved for a mistrial. The court disagreed with that characterization of the testimony, and denied the mistrial, but offered to instruct the jury to disregard whatever it had heard from this particular witness with regard to advertisements. Philip Morris's counsel, Mr. Leiter, replied, "We would ask that the court affirmatively

---

[20] On rehearing, Philip Morris contends that we erroneously interpreted the running objection as relating to youth marketing, rather than evidence of preempted neutralization claims. Philip Morris still does not identify a *particular, identifiable body of evidence*, whether it is evidence of preempted neutralization, youth marketing, or some other theory. An objection to "this whole area," even if clearly based upon *Cipollone, supra*, 505 U.S. at pages 524, 527–528, does not preserve the issue for appeal. (Cf. *People v. Morris, supra*, 53 Cal.3d at pp. 188–190.)

instruct the jury that it may not find liability in this case based on any accusation or any evidence that healthy images in ads undercut the health warnings mandated by the Congress."

The court refused to give this specifically requested language. But contrary to Philip Morris's suggestion that no instruction was given on the issue, the court did instruct as follows: "Ladies and gentlemen, just before we took the break, there was some testimony from this witness regarding certain advertising images and their potential effects. You'll recall that testimony. [¶] I instruct you at this time that with respect to that testimony, I want you to *disregard it for all purposes and do not use it for any purpose whatsoever* in this trial." (Italics added.) Since Philip Morris has referred to nothing to the contrary, we presume the jury followed the court's instruction. (See *People v. Harris* (1994) 9 Cal.4th 407, 426 [37 Cal.Rptr.2d 200, 886 P.2d 1193].)

The second instruction that Philip Morris claims the court erroneously refused was its proposed instruction J.[21]

As with proposed instruction O, we find no ruling by the trial court rejecting this instruction. Our request for a citation to the record for the trial court's purported refusal of instruction O also included a request for a citation to the court's purported refusal of Philip Morris's proposed instruction J. Philip Morris has provided no such citation, and has not attempted to augment the record with an agreed or settled statement. (See *Maria P. v. Riles*, *supra*, 43 Cal.3d at p. 1295; *In re Kathy P.*, *supra*, 25 Cal.3d at p. 102; Cal. Rules of Court, rules 6, 7, 12(a).) But we did find proposed instruction J in the group of instructions under cover of the "Objections of Defendant Philip Morris Incorporated to Court's Rejection of Certain Jury Instructions Proposed by Defendant."

---

[21] The proposed instruction reads as follows: "Regardless of any of the other rules of law set forth in these instructions, you must follow the rules of federal law which I shall now give you. [¶] Because of federal law, you cannot hold defendant liable on the basis that after July 1, 1969, it should have included additional or more clearly-stated warnings in the advertising or promotion of [its] cigarettes because, as a matter of federal law, after July 1, 1969, defendant adequately warned plaintiff of the health risks of smoking, including 'addiction.' [¶] Also because of federal law, and except only as stated below, you cannot hold defendant liable on the basis that it: [¶] (a) through its advertising or promotional practices, neutralized, minimized, or undermined the effect of the federally mandated warnings appearing on every cigarette package after July 1, 1969, or [¶] (b) after July 1, 1969, failed to disclose, or concealed, or suppressed information about the health risks of smoking including 'addiction.' [¶] The federal law does not limit the potential liability of defendant against claims that its product was defective in design in other respects, or that the defendant was negligent in other respects in the design of their product. The federal law also does not limit the potential liability of defendant against claims that it made affirmative misrepresentations about the health risks of smoking."

██ If the trial court did, in fact, refuse instruction J, Philip Morris has failed to demonstrate error. A trial court is not required to give instructions in the precise language proposed, and it is not error to refuse instructions that are not reasonably brief, concise, and understandable to the average juror. (*Dodge v. San Diego Electric Ry. Co.* (1949) 92 Cal.App.2d 759, 763–764 [208 P.2d 37].)

██ "Proposed instructions which are argumentative and misleading should not be given. [Citation.] Instructions should not draw the jury's attention to particular facts. It is error to give and proper to refuse an instruction that unduly overemphasizes issues, theories or defenses either by repetition or by singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.] . . . Repetitious reference, in the instructions, that under the circumstances related the jury 'must find in favor . . . of defendant' has been condemned. [Citation.]" (*Dodge v. San Diego Electric Ry. Co., supra*, 92 Cal.App.2d at p. 764.) Instruction J suffered from all these infirmities, and the trial court had no duty to give it.

██ In any event, "[n]o judgment shall be set aside . . . on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) The burden is on Philip Morris, as appellant, to show that error has resulted in a miscarriage of justice. (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 83 [265 P.2d 513].) Philip Morris has failed to so demonstrate.

In fact, the trial court instructed the jury regarding the 1969 limitations throughout its charge to the jury.

With regard to fraudulent concealment, the court instructed, "[F]ailure to disclose . . . is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose . . . prior to July 1, 1969." The special verdict form asked, "Prior to July 1, 1969, did defendant conceal or suppress a material fact?"

With regard to the product liability claim, the court instructed, "A product may be defective because of a defect in design or a failure to adequately warn the consumer prior to July 1, 1969"; and "[A] product is defective if the manufacturer . . . has a duty to warn of dangers and fails to provide an adequate warning of those dangers prior to July 1, 1969, a date established by law in this case"; and "A cigarette manufacturer has a duty to warn prior to July 1, 1969 if [etc.]"; and "For the period prior to July 1, 1969, one who supplied a product . . . has a duty to use reasonable care to give warning."

Further, the special verdict form asked, "Was there either (1) a defect in design, or (2) a defect resulting from a failure to warn occurring before July 1, 1969?"

Thus, the jury was not permitted, as Philip Morris contends, to base liability upon a failure to warn after July 1, 1969, or upon advertising that minimized or neutralized the federally mandated warning after that date.

Philip Morris complains that opposing counsel was permitted to argue that Philip Morris was the " 'devil' because of its allegedly glamorous advertising practices"; that Philip Morris " 'spent hundreds of millions and billions of dollars putting out advertising images to the exact contrary' of the dangers of smoking"; that " 'Marlboro is on the side of Ferraris in Formula One Racing [and] guys, especially, who see themselves, adventurous or resourceful or strong go for that.' Mr. Boeken did. He saw himself as that man."

If opposing counsel's argument tended to minimize or neutralize federally mandated warnings, it was incumbent upon Philip Morris to object and request that the jury be admonished. (See *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750].) Since it did not do so, it waived any contention based upon improper argument. (*Ibid.*; *Horn v. Atchison T. & S.F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].)[22]

We conclude that Philip Morris has failed to meet its burden to show that the trial court erred by refusing its instructions, as well as its burden to show that any such refusal amounted to a miscarriage of justice.

### 5. *Youth-targeting*

Citing *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057 [31 Cal.Rptr.2d 358, 875 P.2d 73] (*Mangini*) and *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525 [150 L.Ed.2d 532, 121 S.Ct. 2404] (*Reilly*), Philip Morris contends that the trial court erred in permitting counsel for Boeken to argue repeatedly to the jury that Philip Morris targeted youth in its advertising, and in failing to instruct the jury that it could not consider evidence of such advertising.

---

[22] For the first time on rehearing, Philip Morris contends that the purpose of its proposed instruction J was to be an admonishment. Since there is no language in the instruction directed at opposing counsel's argument, this argument appears to be merely an afterthought.

The jury began its deliberations on May 22, 2001, and returned its verdict on June 6, 2001. On those dates, the California Supreme Court's opinion in *Mangini* had not yet been called into doubt by the United States Supreme Court's opinion in *Reilly*, which was published on June 28, 2001.

*Mangini* held that an unfair competition action seeking to enjoin youth-targeted advertising was not preempted by the 1969 Act, because such advertising was "not 'based on smoking and health'; [but] 'the more general duty not to' unfairly assist or advertise illegal conduct [selling cigarettes to minors]. [Citation.]" (*Mangini, supra,* 7 Cal.4th at p. 1069, quoting *Cipollone, supra,* 505 U.S. at p. 529.)

*Reilly* concerned a Massachusetts law that prohibited outdoor advertising and regulated point-of-sale advertising of cigarettes and other tobacco products "within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school." (*Reilly, supra,* 533 U.S. at p. 535.) The United States Supreme Court did not perceive a "distinction between the specific concern about minors and cigarette advertising and the more general concern about smoking and health in cigarette advertising, especially in light of the fact that Congress crafted a legislative solution for those very concerns." (*Id.* at pp. 550–551.)

The Court also found no "distinction between state regulation of the location as opposed to the content of cigarette advertising . . . in the text of the pre-emption provision. Congress pre-empted state cigarette advertising regulations . . . because they would upset federal legislative choices to require specific warnings and to impose the ban on cigarette advertising in electronic media in order to address concerns about smoking and health. Accordingly, [the Court held] that the [Massachusetts] outdoor and point-of-sale advertising regulations targeting cigarettes are pre-empted by the FCLAA [the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 et seq.]." (*Reilly, supra,* 533 U.S. at p. 551.)

Although no claim in this case was based upon post-1969 advertising, Philip Morris contends that the improper argument of counsel permitted the jury to assess punitive damages based upon evidence of post-1969 youth-targeted advertising. It argues that any objection would have been futile because the reasoning of *Mangini* would have permitted such evidence and argument and it was not until after trial was concluded that *Reilly* effectively overruled *Mangini.*

To the extent that Philip Morris's contention is, in effect, an evidentiary challenge, such "challenges are usually waived unless timely raised in the trial court, [unless] the pertinent law later changed so *unforeseeably* that it is unreasonable to expect trial counsel to have anticipated the change. [Citations.]" (*People v. Turner* (1990) 50 Cal.3d 668, 703 [268 Cal.Rptr. 706, 789 P.2d 887], italics added.)

And where a party fails to request a limiting instruction with regard to the admissibility of evidence that the law did not deem inadmissible until after trial, the issue may be raised on appeal if neither trial counsel nor the trial judge had *any way of knowing* that the Supreme Court would act as it did. (*People v. Vinson* (1969) 268 Cal.App.2d 672, 675 [74 Cal.Rptr. 340].) "A contrary holding would place an unreasonable burden on defendants to anticipate *unforeseen* changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule . . . would be changed on appeal." (*People v. Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17], italics added.)

Philip Morris does not suggest that it had no way of knowing that the United States Supreme Court would issue an opinion in which it would conclude that liability based upon post-1969 youth-targeted advertising was preempted by federal law. Nor does it suggest that the implicit overruling of *Mangini* by *Reilly* was unforeseen by Philip Morris. Indeed, Philip Morris was a party to the district court case reviewed in *Reilly*, and one of the petitioners in *Reilly*. (See, e.g., *Reilly*, *supra*, 533 U.S. 525; *Consolidated Cigar Corp. v. Reilly* (1st Cir. Mass. 2000) 218 F.3d 30.)[23] Thus, Philip Morris may not rely upon the futility of objecting or requesting a limiting instruction.

And we would find no error in allowing Boeken's counsel to argue as he did, even if *Reilly* had been published prior to trial. Boeken's counsel did not argue, as Philip Morris suggests, that the jury should consider such advertisement to justify a greater punitive damage award. Counsel's argument was in response to evidence and argument presented by Philip Morris with regard to youth marketing.

Ellen Merlo, senior vice-president of corporate affairs at Philip Morris and a member of the management team responsible for community relations, public affairs, and corporate responsibility programs, testified on behalf of Philip Morris that "We sincerely don't want kids to smoke." Merlo claimed

---

[23] We take judicial notice on our own motion of the United States Supreme Court docket in *Lorillard Tobacco Co. v. Reilly*, Case No. 00-596. (See Evid. Code, § 452, subd. (d).) The docket may be viewed at <http://www.supremecourtus.gov/docket/00-596.htm> (as of Apr. 1, 2005).

that not only did Philip Morris not market to minors, but worked affirmatively to prevent them from smoking. In April 1998, Philip Morris created a new department, its Youth Smoking Prevention Department, which has devoted over $100 million per year to antismoking measures. For example, since the Superbowl reaches the largest number of 9 to 14 year olds in the season, Philip Morris ran antismoking ads on the telecast of the 2000 Super Bowl. While much of the money is spent on advertising, the department also funds grants, such as to 4-H, to develop youth antismoking programs. Philip Morris also undertook a campaign to urge parents and older siblings to be more responsible in where they leave their tobacco and not to purchase cigarettes for minors.

Merlo also claimed that Philip Morris punishes retailers who have been convicted or fined for selling its products to minors. Philip Morris has agreements with retailers under which the retailers are paid to display and sell its products. Upon the first conviction, Philip Morris withdraws payment for one month; upon the second conviction, four months; and upon the third conviction, two years. Since 1995, several thousand retailers have been punished, some of them losing thousands of dollars in withheld payments.

In addition, Merlo testified, Philip Morris advocates a policy of keeping its merchandise behind the counter, discourages retailers from placing cigarettes or advertising at children's eye level or near the candy, does not sell its products by mail or over the Internet, since it is impossible to check the age of the buyer, and it has stopped giving free samples.[24]

Merlo explained that in 1997, when Mike Szymanczyk became CEO of Philip Morris U.S.A., Philip Morris changed its approach, in order to "become responsible and to earn back some credibility." He therefore adopted the Surgeon General's position, created a mission with a "set of core values that would guide the company and then to set some very specific goals . . . as we moved forward." The new mission statement expressed the company's goal "to be the most responsible, effective and respected developer, manufacturer [and] marketing the best quality tobacco products available to adults who choose to use them." One way to attain that goal is to take "a proactive and active stance in dealing with the issue of youth smoking prevention."

In closing argument, counsel for Philip Morris urged the jurors not to decide the case based upon anger, bias, or emotion, or to "go into that jury room and hammer [Philip Morris]" because, he argued, Philip Morris is "doing things differently now." Counsel referred to Merlo's testimony, acknowledged that the company had made mistakes over the years, and pointed

---

[24] Sampling was outlawed in California in 1995. (Health & Saf. Code, § 11895.)

out that it was trying very hard to make changes and to sell its product in a responsible way.

Thus, without expressly mentioning punitive damages, it appears that the strategy of Philip Morris was to show there was no need for punishment, since it had changed the policies that led to Boeken's nicotine addiction. Philip Morris may not complain of the admission of evidence it offered itself. (*Gjurich v. Fieg* (1913) 164 Cal. 429, 433 [129 P. 464].)

Because Philip Morris presented the testimony of Merlo, Boeken's counsel was entitled to comment upon the evidence in argument. (See *People v. Mincey* (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr.2d 822, 827 P.2d 388].) This is just what Piuze did when he said, "[I]f Philip Morris gives up targeting teenage smokers, Philip Morris will literally be out of the tobacco business," and "Philip Morris isn't giving up targeting teenage smokers." Just preceding the comments, and not quoted by Philip Morris, Piuze said, "I hope to be able to show . . . that *despite evidence here and proclamations here from Philip Morris to the contrary*, they cannot give up targeting teenage smokers." (Italics added.)

Similarly, Philip Morris complains of comments at page 5900 of the reporter's transcripts, although it does not quote them in its briefs, where Piuze urged the jury not to believe Philip Morris's evidence. He said, "Ellen Merlo saying, we will stop selling to kids and targeting kids is like that guy in 1954 saying, if this product is harmful, we'll stop, we'll [get] out of the tobacco business."[25] Philip Morris also complains about the argument on pages 6222, 6224, and 6225 of the reporter's transcript. Again, Piuze was urging the jury not to believe Merlo's testimony.

Where a party has " 'opened the door' " on an area, it is estopped from complaining that its opponent has profited by it. (*Morris v. Frudenfeld* (1982) 135 Cal.App.3d 23, 32 [185 Cal.Rptr. 76]; see also *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 [6 Cal.Rptr.2d 698].)

Counsel is accorded wide latitude in arguing his case to a jury and " ' "has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom." ' " (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 798–799 [174 Cal.Rptr. 348]

---

[25] The 1998 deposition testimony of former Philip Morris CEO Geoffrey Bible in another case was read to the jury. He testified that he did not know whether anybody had died as a result of smoking, and if he thought someone had died because of his product, he would shut down the business.

(*Grimshaw*).) Thus, even if Philip Morris had objected to the remarks, the court would not have erred by overruling the objection.

### 6. *Impeachment with Felony Conviction*

Philip Morris contends that the trial court abused its discretion in refusing to allow it to impeach Boeken with a 1992 felony wire fraud conviction.

Boeken brought a motion in limine to exclude any reference to his three criminal convictions, one in 1972 for receiving stolen property, one in 1976 for possession of heroin, and the 1992 wire fraud conviction. With regard to the latter, Boeken had been convicted after pleading guilty in a plea bargain to one count of wire fraud as an aider and abettor. (See 18 U.S.C. §§ 1343, 2(a).) He admitted having sold a fraudulent investment in 1987 while employed as a securities salesman.

The motion in limine was granted, *without* prejudice, after which the following exchange occurred:

"THE COURT: At this time, what I will do is I will grant the motion in limine in its entirety as to the felony convictions and they will not be admitted for any purpose, nor will counsel refer to it in any way, either directly or indirectly, through counsel or through any witnesses that may take the stand.

"It's without prejudice.

"If we get very far into any character issues—

"MR. LEITER: And by suggesting we defer it, I hadn't anticipated Your Honor was going to rule.

"THE COURT: I know you did.

"MR. LEITER: Obviously, credibility of the plaintiff is a key issue in the case. Income is a key issue in the case. And the conviction goes to both. And we would like to be heard on both of those issues, either now or at the appropriate time.

"THE COURT: All I can say to you is that I am certainly willing to listen. But based on the information that I have at the present time that's been presented to me in this motion in limine, I looked at it, I thought about it long and hard, balanced the [Evidence Code] 352 issues, it turns out from what I have seen so far, I am satisfied that I made—that my instincts led me in the right direction and it was correct not to admit this evidence and that it would have been the very effects that 352 is designed to prevent occurring in a trial.

"But at the same time, I haven't seen everything, and there must be a certain amount of openness. But at the present time, this motion is granted."

Despite the fact the ruling was without prejudice, Philip Morris did not attempt to resurrect the issue again until its motion for new trial. It now contends that the court abused its discretion in excluding the conviction for three reasons: it was not too remote; fraud is probative on the issue of credibility; and Boeken's veracity was a "central issue."

The trial court's determination whether to admit or exclude a prior felony conviction for purposes of impeachment was made pursuant to Evidence Code section 352. (*Robbins v. Wong* (1994) 27 Cal.App.4th 261, 274 [32 Cal.Rptr.2d 337].) Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

■ "If a proper objection under section 352 is raised, the record must affirmatively demonstrate that the trial court did in fact weigh prejudice against probative value. The trial court need not make findings or expressly recite its weighing process, or even expressly recite that it has weighed the factors, so long as the record as a whole shows the court understood and undertook its obligation to perform the weighing function. [Citations.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 599 [103 Cal.Rptr.2d 492].) An exercise of discretion under Evidence Code section 352 will be disturbed on appeal only if the trial court exercised it in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

We agree that a fraud conviction is probative with regard to credibility. But Philip Morris has not shown that its exclusion was arbitrary, capricious, or patently absurd, or that it resulted in a manifest miscarriage of justice. (See *People v. Rodrigues, supra*, 8 Cal.4th at p. 1124.) Notably absent from Philip Morris's argument is any contention that the probative value of the conviction might outweigh the consumption of time that would have been taken up by the issue.

### 7. *Juror Misconduct*

Philip Morris contends that the trial court erred in removing a juror during deliberations.

 The trial court's discretion to discharge a juror who refuses to deliberate is reviewed for abuse of discretion and will be upheld if there is any substantial evidence supporting the ruling, so long as the juror's refusal to deliberate appears in the record as a " ' "demonstrable reality." ' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)

On the morning of May 23, 2001, one day into deliberations, the foreperson sent out two notes to the judge stating, among other things: "We . . . need instruction regarding Juror # 5 . . . who is not participating in the discussion. She sits away from the table and reads her bible instead of contributing to the group conversation," and "Can we discuss the distraction regarding Juror # 5. . . . She is not seating [*sic*] with us during the discussion. She instead chooses to read her bible and does not contribute to the group conversation."[26]

In response to the note, the court reread to the jury the following excerpt from BAJI No. 15.52: "All jurors should participate in all deliberations."

Later, the foreperson sent out another note. "Per the court's instruction, Juror No. 5 is still not willing to sit around the discussion table and participate. She chooses to continue to read her bible, and it is upsetting the other jurors. This distraction is making it difficult for us to deliberate. I and a few other jurors have spoke [*sic*] with [Juror No. 5] about this."

The court then questioned Juror No. 5 separately in chambers. She denied that she had been reading her Bible during deliberations, although she kept it in front of her. She admitted that she did not sit "all the way up" at the table, but denied that she sat away from the table, failed to listen, or slept during deliberations.

Juror No. 5 explained to the court that questions had been raised in the jury room about her addiction to morphine, and she found that avoiding eye contact helped her to avoid painful memories. She did this for "[her] own sanity." She then admitted that she had been sitting in the corner, explaining that she could not be expected to sit there and "giggly-gaggly play little games" because she was "not that hypocritical."

The trial judge urged Juror No. 5 to participate, to explain her concerns to the other jurors, and to ask them to be courteous, since they probably would attempt to get along if they understood her feelings. Juror No. 5 responded that she got along with individual jurors, but "now it is like them against

---

[26] The record is not clear on the timing and sequence of the various notes.

me." The judge explained that deliberating means listening, sharing her views, and participating. Juror No. 5 replied, "I totally agree. I have attempted to do that." She agreed to go back in, talk to the other jurors, and to try to "square it away."

Later that day, however, the foreperson sent out another note, which read: "Wish to speak with the judge on a one and one basis regarding [Juror No. 5]. We feel that she is being disruptive and have [*sic*] shown animosity towards some of the jurors who has [*sic*] spoken to her regarding the reading and participation," and "Per the court's instruction, Juror No. 5 is still not willing to sit around the discussion table and participate. She chooses to continue to read her bible, and it is upsetting the other jurors. This distraction is making it difficult for us to deliberate. I and a few other jurors have spoke [*sic*] with [Juror No. 5] about this."

The court then undertook to question each juror individually in chambers. The judge was careful to caution each juror not to reveal the contents of deliberations, and asked for any comments about the information he had received regarding some difficulty concerning one of the jurors.

Juror No. 2 reported that the trouble began after Juror No. 5 became angry when she was not elected foreperson. It appeared to Juror No. 11 that Juror No. 5's personality totally changed once the foreperson was picked. Juror No. 6, the foreperson, reported that Juror No. 5 participated until she failed to win election as foreperson. She then became hostile, and warned Juror No. 6 that she would "shut it down" if she were not left alone.

Six jurors reported that Juror No. 5 would sit with her back turned against the other jurors, and Juror No. 5 admitted turning her chair around and sitting with her back to the other jurors on both days of deliberations.

Juror No. 1 reported that Juror No. 5 would not sit with the others, and that she either read her book or appeared to sleep during deliberations. Five more jurors reported either that Juror No. 5 appeared to be sleeping much of the time, or she sat with her eyes closed.

Jurors No. 7, 8, and 9 reported that Juror No. 5 never looked at the exhibits, and the latter two reported that she did not review her notes. Eleven jurors reported that Juror No. 5 read her book while the others deliberated. Juror No. 5 admitted that she read a novel (not the Bible) during deliberations, although she then claimed that she was not actually reading. Juror No. 11 thought that Juror No. 5 was, in fact, reading, since she smiled occasionally while looking at her book, and the smile obviously did not relate to any discussion among the other jurors.

Ignoring the reports we have just summarized, Philip Morris points to comments by several jurors, including Juror No. 5, which would have supported a contrary resolution of the issue by the trial court. But we must accept the trial court's resolution of credibility issues and factual conflicts, unless they are not supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

Philip Morris also attaches to its opening brief a declaration of Juror No. 5 dated June 7, 2001, and a letter from one of the other jurors, posted on the Internet on June 23, 2001. These exhibits add nothing to the preverdict evidence other than the mental processes of the two jurors. They may not be used impeach the verdict. (See Evid. Code, § 1150.)

Philip Morris suggests that the facts of this case are similar to those of *People v. Bowers* (2001) 87 Cal.App.4th 722 [104 Cal.Rptr.2d 726] (*Bowers*), which were held to justify a reversal. (See *id.* at p. 735.) We disagree. In *Bowers*, only one other juror reported that the discharged juror had slept, and there was no evidence of how long or how frequently. (*Id.* at p. 731.) Here, *all* the other jurors reported that Juror No. 5 appeared to sleep or read throughout the two days of deliberations.

In *Bowers*, behavior reported as inattentiveness consisted of the juror's habit of walking around with his arms crossed and refusing to respond, as a means of expressing that he did not agree with the other jurors' evaluation of the evidence. (*Bowers, supra,* 87 Cal.App.4th at pp. 730–731.) Here, substantial evidence established that Juror No. 5 separated herself physically from the other jurors, did not pay attention to their deliberations and, instead, slept or read a novel, the Bible, or both, throughout the two days during which she was a member of the deliberating jury.

We conclude that such circumstances support a finding of a "demonstrable reality" that Juror No. 5 refused or was unable to deliberate, and that the trial court did not, therefore, abuse its discretion in discharging her. (See *People v. Cleveland, supra,* 25 Cal.4th at p. 484.)

8. *Punitive Damages*

Philip Morris moved for a new trial on the jury's award of $3 billion in punitive damages. The trial court denied the motion, conditioned upon Boeken's acceptance of a reduction of punitive damages to $100 million. Boeken accepted the reduction. Philip Morris contends that even the reduced punitive damage award is excessive under both California law and the United States Constitution. In her cross-appeal, Boeken contends that the trial court erred in reducing the award. We begin by reviewing the applicable law.

■ In California, punitive damages may be awarded by a jury where clear and convincing evidence establishes a defendant is guilty of "oppression, fraud, or malice . . . for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).)

■ "The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts. [Citations.]" (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980] (*Neal*).) *Neal* reiterates the California standard to determine if an award is excessive: As we pointed out in *Bertero v. National General Corp.* [(1974)] 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608], our review of punitive damage awards rendered at the trial level is guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorable to the judgment, indicates were *rendered as the result of passion and prejudice. . . .*' [Citation.]" (*Id.* at p. 927, italics added.)

■ *Neal* listed three factors to consider in reviewing whether an award is excessive: (1) the *reprehensibility* of the acts of the defendant in light of the record as a whole; (2) the amount of *compensatory damages* awarded; and (3) the *wealth* of the particular defendant. (*Neal, supra,* 21 Cal.3d at p. 928.) These factors were reiterated in *Adams v. Murakami* (1991) 54 Cal.3d 105, 109–110 [284 Cal.Rptr. 318, 813 P.2d 1348].

■ In California, a trial court reviews a motion challenging the excessiveness of an award of punitive damages similar to other motions for new trial, as a "thirteenth juror": "The trial court is in a far better position than an appellate court to determine whether a damage award was influenced by 'passion or prejudice.' (Code Civ. Proc., § 657.) In reviewing that issue, moreover, the trial court is vested with the power, denied to us, to weigh the evidence and resolve issues of credibility. [Citation.]" (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].) We review the trial court's determination for an abuse of discretion. (*Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 858 [236 Cal.Rptr. 778], disapproved on another ground in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15 [17 Cal.Rptr.3d 302, 95 P.3d 523].)

■ The United States Supreme Court has also provided three "guideposts" for such review: "(1) the degree or reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 440 [149 L.Ed.2d 674, 121 S.Ct. 1678].)

 In connection with a federal due process challenge, trial and reviewing courts conduct de novo review. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 440.)

Our Supreme Court, in *Adams v. Murakami, supra,* 54 Cal.3d at page 112, has noted the difficulty in addressing the issue of excessiveness of punitive damages: "The determination of whether an award is excessive is admittedly more art than science. 'The channeling of just the correct quantum of bile to reach the correct level of punitive damages is, to put it mildly, an unscientific process complicated by personality differences.' [Citation.]"

Utilizing the foregoing principles, we review the evidence and the trial court's determination.

### (1) *Reprehensibility of Conduct*

The trial court, reviewing the motion for new trial pursuant to California and federal law, concluded that "Philip Morris's conduct was in fact reprehensible in every sense of the word, both legal and moral." We agree.

 In California, it has been held that intentionally marketing a defective product knowing that it might cause injury and death is "highly reprehensible." (*Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738, 755 [6 Cal.Rptr.3d 793].) The court in *Romo* found Ford's conduct justified a punitive damage award of approximately $23 million. Another court, also reviewing the actions of Ford Motor Company in connection with the marketing of a defective product, affirmed an award of $3.5 million in punitive damages with the following language: "[T]he conduct of Ford's management was reprehensible in the extreme. It exhibited a conscious and callous disregard of public safety in order to maximize corporate profits." (*Grimshaw, supra,* 119 Cal.App.3d at p. 819.)

 The most recent United States Supreme Court decision on punitive damages, *State Farm Mutual Automobile Insurance Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*), identified several subsidiary factors which guide the determination of the degree of reprehensibility: (1) whether "the harm caused was physical as opposed to economic"; (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether "the harm was

the result of intentional malice, trickery, or deceit, or mere accident." (*Id.* at p. 419.) The court then noted: "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation.]" (*Ibid.*)

 The court also held that " 'repeated misconduct is more reprehensible than an individual instance of malfeasance' " and " 'a recidivist may be punished more severely than a first offender,' " so long as "the conduct in question replicates the prior transgressions." (*State Farm, supra,* 538 U.S. at p. 423.) Also, evidence of great profit may be relevant to show greater degree of reprehensibility. (*Id.* at p. 424.)

 It also concluded that due process prohibits the imposition of punitive damages for unrelated unlawful acts committed outside of the state's jurisdiction, or acts that were lawful in the jurisdiction where they occurred. It explained: "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." (*State Farm, supra,* 538 U.S. at p. 423.) *But, similar out-of-state conduct may be relevant to the issue of reprehensibility when it demonstrates the deliberateness and culpability of the acts committed in the state where they are tortious, so long as the conduct has a "nexus to the specific harm suffered by the plaintiff." (Id.* at p. 422, italics added.)

Utilizing the five factors listed in *State Farm,* all show a high degree of reprehensibility and weigh in favor of the jury's conclusion that a substantial punitive damage award was appropriate in this case. The evidence supports the conclusion that Boeken's injuries were caused by Philip Morris's fraud and defective product, and were physical, not merely economic. Philip Morris's conduct was repeated over a period of almost 50 years with an indifference to the health or safety of Boeken and others, and Boeken was physically and psychologically vulnerable, and eventually, economically vulnerable.

Philip Morris manufactured a dangerous product, knowing that it was a dangerous product—one that caused addiction and disease—and it added chemicals to the product to make it more addictive and easier to draw into the lungs, thus making it *more* dangerous. At a young age, Boeken was drawn to the product and to the Marlboro brand with misleading advertising specifically targeted to male adolescents. He was kept smoking with misleading statements and falsehoods about smoking, disease, and addiction, the believability of which was enhanced by addiction; and Boeken's addiction was ensured by increasing Marlboro's nicotine delivery.

Philip Morris contends that its fraud cannot be deemed reprehensible, because the health risks of smoking were public knowledge for decades; because the State of California protected cigarette companies from liability for the 10-year period of former Civil Code section 1714.45; and because its tortious conduct was "remote," as shown by the trial court's instruction to the jury limiting liability for Philip Morris's fraudulent concealment to conduct that occurred prior to 1969.

We cannot agree with Philip Morris's suggestion that section 1714.45 makes its conduct less reprehensible on the ground that it provided immunity from liability for fraud and dangerous product under the facts of this case. Philip Morris added urea to make Marlboros more addictive, and flavorings to make it easier for the smoke to reach the lungs. Section 1714.45, as we have discussed, provided immunity only for *unadulterated* tobacco products. (See *Naegele, supra,* 28 Cal.4th at pp. 864–865; *Myers, supra,* 28 Cal.4th at p. 837.)

The health risks of smoking may have been public knowledge for decades, but given the evidence of the false controversy created by Philip Morris, the adulterations added to the cigarettes, the nature of addiction, the fact that Boeken failed to understand and appreciate the risks of smoking, and Philip Morris's marketing of so-called light cigarettes, knowing that they are more dangerous than ordinary consumers expect, this argument fails.

In addition to fraud, the evidence establishes that Philip Morris acted with a conscious disregard of consumer health and safety in the manufacture and marketing of a dangerous product, and intentionally took advantage of the consumer expectation that "light" cigarettes were safer.

Philip Morris knew that there was no reason to believe Marlboro Lights or Ultralights were any safer than its Reds. Compensation has been described in scientific literature for 40 years and Philip Morris's own research found no

reduction in tar delivery for Marlboro Lights over regular cigarettes, but Philip Morris has only just recently initiated a study of human smokers to measure how much tar they actually take in. And although Philip Morris's laboratories were "state of the art," its studies of biological activity, using actual cigarettes that it markets, did not begin until 1999 or 2000.

Further demonstrating a conscious disregard for consumer safety, Philip Morris was *still* marketing "light" cigarettes at the time of trial, knowing that they may increase the risk of more serious cancers. And Philip Morris was still adding urea to Marlboro tobacco, causing more nicotine to be delivered more quickly to the smoker, as well as flavorings to create bronchodilators to open up the lungs.

The Marlboro Lights or Ultralights smoked by Boeken resulted in adeno-carcinoma of the lung, which spread to his brain and spine. Since 1959, it has been known that smoking is the cause in more than 90 percent of the cases of this aggressive form of lung cancer. But Philip Morris tested carcinogenicity in secret, in a lab out of the country. There, a less carcinogenic Marlboro cigarette was developed in 1979, using reconstituted tobacco, but it was never marketed, and senior Philip Morris scientist Dr. Osdene received all reports from the secret lab at his home and destroyed them after reading them.

At the time of trial, about 16 million people in the United States smoked Marlboros. Among teenagers, Marlboro is the brand of choice. Marlboro cigarettes are the best selling brand in the country, and the "Golds," so-called light Marlboros, outsell the regular Reds. Experts believe that the increase in lung adenocarcinoma, a more aggressive and fast-spreading cancer, is attrib-utable to low-tar cigarettes, which most smokers believe to be less hazardous. Nevertheless, Philip Morris continued to market light Marlboros.

A smoker's risk of death from all smoking-related causes is 18 to 36 percent, and the longer one smokes, the greater the risk. In 1993, a report of the Environmental Protection Agency concluded that second-hand smoke kills 3000 nonsmoking Americans annually. Dr. Carchmann admitted that of the people who die every year in this country from smoking-related disease, 200,000 are attributable to Philip Morris products.

Philip Morris contends that harm to others cannot be considered in a punitive damage analysis. But as we have previously explained, similar out-of-state conduct may be relevant to the issue of reprehensibility when it demonstrates the deliberateness and culpability of the acts committed in the

state where they are tortious, so long as the conduct has a "nexus to the specific harm suffered by the plaintiff." (*State Farm, supra,* 538 U.S. at p. 422.)[27]

Philip Morris contends that its conduct in other states consisted solely of lawfully selling cigarettes, and that it was not shown to be similar to that which injured Boeken, because there was no evidence that it caused any injury to *specific* persons in other states. We find nothing in *State Farm* that requires proof of injury to specific persons other than the plaintiff, wherever they reside, when the conduct in question is identical, as it was here, since the conduct that injured Boeken was not confined to California. " '[R]epeated mis conduct is more reprehensible than an individual instance of malfeasance' " and " 'a recidivist may be punished more severely than a first offender,' " so long as "the conduct in question replicates the prior transgressions." (*State Farm, supra,* 538 U.S. at p. 423, quoting *BMW, supra,* 517 U.S. at p. 577.)

The very conduct that injured Boeken was directed at all smokers in the United States, repeated over many years with knowledge of the risk to human life and health, and is probative of intentional deceit. The national marketing of a defective product, knowing that ordinary consumers expect it to be less hazardous, knowing that thousands of people will die due to their addiction, is probative of a willful and conscious disregard of the danger to human life. (See *State Farm, supra,* 538 U.S. at pp. 423–424.) We find that a sufficient nexus has been shown here with Philip Morris's conduct in the other states, whether lawful or unlawful, to consider the evidence on the issue of reprehensibility. (See *id.* at p. 422.)

Having concluded that Philip Morris's conduct is "extremely reprehensible," as in *Romo v. Ford Motor Co., supra,* 113 Cal.App.4th 738, and that there is sufficient evidence supporting all five reprehensibility factors under

---

[27] In a related argument raised for the first time in its reply brief, Philip Morris argues that the trial court should have instructed the jury using language similar to that from *State Farm* "that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." Philip Morris forfeited this issue by failing to request such an instruction from the trial court. *State Farm* was not the first case enunciating this concept. It was first addressed in *BMW,* where the Court stated that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 572 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*BMW*).) Thus, *BMW* provided sufficient authority to enable Philip Morris to draft and request an appropriate instruction. The trial court was not required to draft it for Philip Morris. (See *Finn v. G.D. Searle & Co.* (1984) 35 Cal.3d 691, 701 [200 Cal.Rptr. 870, 677 P.2d 1147].) And a party may not complain on appeal of a failure to give an instruction it did not request. (*Linzsey v. Delgado* (1966) 246 Cal.App.2d 504, 509 [54 Cal.Rptr. 762].)

*State Farm*, a substantial punitive damage award was justified. We turn to the second element under each test: the ratio of compensatory damages to punitive damages.

### (2) *Ratio of Compensatory to Punitive Damages*

Here, the original punitive damage award of $3 billion is approximately 540 times the compensatory damage award of $5.5 million. The trial court concluded that such a ratio was not "unprecedented," citing *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443 [125 L.Ed.2d 366, 113 S.Ct. 2711], but it noted, as argued by Philip Morris, that most cases addressing punitive damages in the context of an award of compensatory damages exceeding $1 million have found ratios of 4 to 1 and 3 to 1 more appropriate.

Under California law an award is presumed to be the result of passion and prejudice where it is grossly disproportionate to compensatory damages. (*Neal, supra,* 21 Cal.3d at p. 928; *Rosener v. Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 750 [168 Cal.Rptr. 237].) "[I]n general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small." (*Neal, supra,* 21 Cal.3d at p. 928.) A disparity of 63 to 1 has been presumed to have resulted from passion and prejudice, even where the defendant was a wealthy national corporation and the award represented an acceptable "one fourth of one percent of [the defendant's] net assets, and only three and one-half days of its net income." (*Rosener v. Sears, Roebuck & Co., supra,* 110 Cal.App.3d at p. 750.)

In *State Farm*, the United States Supreme Court observed that in *Pacific Mutual Life Ins. Co. v. Haslip* (1991) 499 U.S. 1, 23–24 [113 L.Ed.2d 1, 111 S.Ct. 1032] (*Haslip*), it had "concluded that an award of more than four times the amount of compensatory damages *might* be close to the line of constitutional impropriety. [Citation.]" (*State Farm, supra,* 538 U.S. at p. 425, italics added.) And the Court was of the opinion that it should be "obvious" that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with ratios in [the] range of 500 to 1, [citation]." (*Ibid.*)

It appears the Supreme Court in *State Farm* meant for ratios to be *instructive*, not *binding*. It refused, as it has in the past, "to impose a bright-line ratio which a punitive damages award cannot exceed," observing that it had " 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and*

*potential* damages to the punitive award' [citation]." It stated that "there are no rigid benchmarks that a punitive damages award may not surpass." (*State Farm, supra,* 538 U.S. at p. 425.)

 The Supreme Court suggested examples of circumstances that might justify ratios greater than previously upheld, such as "where 'a particularly egregious act has resulted in only a small amount of economic damages,' " or "where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.' " (*State Farm, supra,* 538 U.S. at p. 425, citations omitted.) But it acknowledged that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Ibid.*)

 The Court also stated that where "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (*State Farm, supra,* 538 U.S. at p. 425.) The Court's holding was expressly based on the fact that, in that case, "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries." (*Id.* at p. 426.)

Boeken contends that the reasoning of *Mathias v. Accor Economy Lodging, Inc.* (7th Cir. 2003) 347 F.3d 672, justifies a larger ratio because there the defendant's very reprehensible conduct caused bed bug bites, not grave physical injury or death, and a 37:1 ratio was upheld. A higher ratio was justified in that case, however, not solely because of reprehensibility, but also because the great wealth of the defendant, compared to the small compensatory award, might otherwise permit the wealthy defendant to make it economically infeasible to bring the action. (*Id.* at pp. 676–677.)

Relying upon the Supreme Court's suggestion in *State Farm* that where "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee" (*State Farm, supra,* 538 U.S. at p. 425; see *BMW, supra,* 517 U.S. at p. 582), Philip Morris contends that the compensatory award of $5,539,127 was so substantial as to justify only a 1:1 ratio. A similar argument was made to the trial court, which stated: "In the end, this argument leads to the unsupportable proposition that those who commit the most devastating and reprehensible wrongs are given caps on their punitive

damages exposure which those who commit lesser wrongs do not receive—a proposition standing the legitimate and necessary role of punitive damages on its head."

### (3) *The Wealth of Philip Morris*

The third prong of the test in California is the wealth of the defendant: "[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." (*Neal, supra,* 21 Cal.3d at p. 928.)

Both California and the federal authorities agree that profits earned from tortious activity that supports an award of punitive damages are appropriately considered in the amount awarded. (*Haslip, supra,* 499 U.S. at p. 22; *Neal, supra,* 21 Cal.3d at pp. 928–929.)

*State Farm* did not disavow the use of wealth in assessing punitive damages. The principle of federalism remains in play: "[E]ach State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." (*State Farm, supra,* 538 U.S. at p. 422.) What *State Farm* does say is: "The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." (*Id.* at p. 427.) And *State Farm* recognizes that deterrence is one of the primary purposes of punitive damages. (*Id.* at p. 416.)

California courts have routinely upheld punitive damage awards which amounted to a percentage of net worth from .005 percent (*Grimshaw, supra,* 119 Cal.App.3d at p. 820), to 5 percent (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1166 [74 Cal.Rptr.2d 510]), and not exceeding 10 percent. (*Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515 [262 Cal.Rptr. 689].)

Here, the trial court made the following findings regarding wealth:

"Philip Morris offered no evidence of its financial condition and rested entirely on the state of plaintiff's evidence. Plaintiff's expert economist, Robert Johnson, testified essentially unrebutted, that Philip Morris's domestic tobacco company has a value of between $30 and $ 35 billion. The worth of the company's domestic operation is not reported separately in the parent company's annual report and must be broken out using estimations involving income and revenue. California law permits using defendant's wealth, income, or both to estimate financial condition. *Little v. Stuyvesant Life Ins. Co.*

(1977) 67 Cal.App.3d 451 [136 Cal.Rptr. 653]; *Wetherbee v. United States Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678]. A strict accountant's 'assets vs. liabilities' calculation is not required, and Philip Morris offered no expert testimony at trial rebutting the validity of the methodology used by Mr. Johnson.

"While Robert Johnson offered evidence indicating a potential value exceeding $35 billion, ample evidence, uncontradicted by credible contra evidence, exists on the record to support a finding that defendant's current worth at the time of trial was between $30 and $35 billion. Exercising its independent judgment, the Court finds this fact true for the purposes of assessing the reasonableness of the jury's punitive damages award.

"Plaintiff suggests, and the Court agrees, that California cases tend to limit punitive damages awards to sums generally in a range under 10% of a defendant's total worth. [Citation.] As with punitive-to-compensatory ratios, this figure is not a matter of mathematical certainty or invariant. [Citations.] The jury's award here is within the percentage of worth guideline generally allowed by California law."

Given the discretion vested in the trial court, we must give great deference to the trial court's findings in this regard. (*Mosesian v. Pennwalt Corp., supra*, 191 Cal.App.3d at p. 858.) That being so, the trial court is correct that the award of $3 billion in punitive damages falls within the guidelines of California law, being just 10 percent or less of net worth.

 But an inference arises that the jury acted out of passion and prejudice if the award exceeds the amount needed to accomplish the goal of punishment and deterrence. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1259 [1 Cal.Rptr.2d 301].)

> (4) *The Difference Between Punitive Damages and Civil Penalties*

The third guideline under federal law is the "difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra*, 538 U.S. at p. 418; *BMW, supra*, 517 U.S. at pp. 574–575.)

The trial court found little help in this guideline. "Finding analogous penalty provisions sanctioning frauds leading to wrongful death is a difficult, if not impossible, undertaking. Plaintiff points to the California Unfair

Competition Act proscribing 'any unlawful, unfair or fraudulent business act or practice. . . .' Cal. Bus. & Prof. Code § 17200. Using the potential multiples achievable for discrete antitrust violations prescribed by the California Unfair Trade Practices Act, a different law, plaintiff attempts an analogy assuming the sale of each pack of cigarettes as a single violation, leading to staggering potential fines at $1000 per sale. Plaintiff also cites Penal Code provisions purporting to permit fines of $10,000 for each violation, and separate provisions allowing courts to fine employees individually for their misconduct. Philip Morris offers no analogies other than to criticize those proposed by plaintiff. [¶] The Court has not on its own found any convincing analogous civil or criminal penalties that could be imposed for comparable misconduct, and considers this factor relatively neutral in assessing the reasonableness of the jury's punitive damages award here."

The Supreme Court has referred to "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." (*State Farm, supra,* 538 U.S. at p. 425, citing *BMW, supra,* 517 U.S. at p. 581, and fn. 33.)

██ The California Legislature has declared that "keeping children from beginning to use tobacco products in any form and encouraging all persons to quit tobacco use shall be among the *highest priorities* in disease prevention for the State of California." (Health & Saf. Code, §§ 118950, subd. (a)(11), 104350, subd. (a)(9), italics added.) To this end, California imposes civil penalties on persons who furnish cigarettes to minors. (Bus. & Prof. Code, § 22958.) It is also a crime, and carries a possible fine of $1,000 after the third offense. (Pen. Code, § 308, subd. (a).)

██ California also imposes civil fines for "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Although the record contains no evidence of typical fines for unlawful or unfair business practices, we may consider not only civil penalties that are actually imposed, but those that are *authorized* in comparable cases. (*State Farm, supra,* 538 U.S. at p. 418.) A $2,500 civil penalty may be assessed for each violation. (Bus. & Prof. Code, § 17206, subd. (a).) Boeken smoked two and one-half packs of Marlboros per day for 43 years, approximately 40,000 packs, as a result of Philip Morris's continuing fraud. If the sale of each pack to Boeken were considered a violation, fines authorized by statute could amount to nearly twice the $100 million in reduced punitive damages confirmed by the trial court in this case.

We agree with the conclusion of the trial court. This is basically a case of wrongful death resulting from fraudulently marketing a defective product. No analogous civil or criminal penalties have been identified against which to measure the award of punitive damages.

### (5) *Application of the Law to the Facts*

 "[T]he more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal." (*Neal, supra,* 21 Cal.3d at p. 928.)

The trial court's decision is succinct: "After balancing all the relevant considerations, the Court finds that the jury's punitive damage award was legally excessive because it produced an excessive punitive-to-compensatory ratio. While the Court cannot know with certainty what ratio is exactly correct, it finds that a ratio of approximately 20-to-1 is appropriate in this particular circumstance. No party disputes the rationality of the jury's compensatory award of $5,539,127, and the Court, exercising its independent[] judgment determines from all the evidence that a punitive award of $100 million is a reasonable sum to be awarded against Philip Morris in these circumstances."

We recognize the large discrepancy between the compensatory and punitive damages, and the deference to what the trial court's determination on a motion for new trial is due. Nevertheless, we must exercise our own de novo review of the amount ordered by the trial court. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 440.)

We have found Philip Morris's 40 years of fraud and its *continuing* conscious disregard for the safety and lives of the consumers of its so-called low-tar Marlboros to be "exceptionally extreme." On the other hand, the compensatory damage award was significant. The ultimate question is how much is necessary to deter and punish the activity, a conundrum recognized by our Supreme Court in *Adams v. Murakami, supra,* 54 Cal.3d at page 110: "The nature of the inquiry is a comparative one. Deciding in the abstract whether an award is 'excessive' is like deciding whether it is 'bigger,' without asking 'Bigger than what?' "

The trial court reached its conclusion before *State Farm* had been decided. Although *State Farm* reiterated many principles which had been laid down before the trial court ruled, its discussion regarding ratios shed new light on application of the principles.

Recognizing that history, and applying *State Farm*'s principles, one California court applied a ratio of nearly 4:1, which was, in its opinion, the outer constitutional limit for an *unexceptional* fraud case that caused only economic damages that were "neither exceptionally high nor low," and in which the fraudulent conduct was "neither exceptionally extreme nor trivial." (*Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1057 [135 Cal.Rptr.2d 736].) Another California court concluded "that an award at the high end of the single-digit ratio spectrum is justified." (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 26 [14 Cal.Rptr.3d 89].) It allowed a ratio of 9 to 1, but the wrongdoing caused no physical injury or death and the "amount of damages suffered by plaintiffs was relatively small in comparison to the seriousness of the defendants' conduct." (*Id.* at p. 23.)

A multiplier of .05 percent of Philip Morris's net worth of $30 to 35 billion, as approved in *Grimshaw* for very reprehensible conduct over just *three* model years of the Ford Motor Company's Pinto automobile, would result in an award of $17.5 million. (See *Grimshaw*, *supra*, 119 Cal.App.3d at pp. 775, 792, 820.) *Forty* years of fraud and the *ongoing* (at least at the time of trial) marketing of a deadly and addictive product more dangerous than ordinary consumers expect, merits a greater multiplier.

Evidence indicated that Philip Morris earns a profit of nearly $15 million per day, and a week's profit, as approved in *Neal*, *supra*, 21 Cal.3d at page 929, would therefore be nearly $103 million, very close to the reduced award in this case. Such a figure can be reconciled with the wealth that Philip Morris derives from California. A multiplier of 5 to 10 percent of net worth may be necessary to deter a very wealthy wrongdoer. (See *Weeks v. Baker & McKenzie*, *supra*, 63 Cal.App.4th at p. 1166; *Storage Services v. Oosterbaan*, *supra*, 214 Cal.App.3d at p. 515.) Although Philip Morris's profits in California are unknown, evidence suggests that 18 percent of the residents of this very populous state are smokers; Philip Morris enjoys a very large market share; and $100 million is less than 7 percent of a 1/50th share of Philip Morris's net worth.

 Philip Morris contends that since other California juries have returned verdicts including substantial punitive damages for the same conduct, there is less need to further the state's interest in deterrence by approving a greater award. We agree that punitive damages previously imposed against it for the same conduct in other cases, as well as possible future awards, are relevant in determining the amount of punitive damages required to sufficiently punish and deter, so long as they are shown to have identical issues. (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1661 [57 Cal.Rptr.2d 525].)

In support of this point, Philip Morris refers to two judgments taken against it on similar facts. One, *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635 [11 Cal.Rptr.3d 807], has been reversed by the Court of Appeal. In the other, *Henley v. Philip Morris, Inc.* (Cal.App.), review granted Apr. 28, 2004, S123023), the Court of Appeal reversed the punitive damage award to $9 million, conditioned upon the plaintiff's acceptance. But the appellate court in that case was bound by a net worth finding of just $3.4 billion. Here, the trial court concluded the net worth was in the range of $30 to $35 billion.

Philip Morris contends that the state's interest in deterring future wrongs is satisfied by the 1998 Master Settlement Agreement (MSA), asserting that the MSA requires it to pay $20.5 billion to the State of California over a number of years, beginning in 2000 and ending in 2025, and that such sum is designed to deter Philip Morris from engaging in the same conduct upon which the punitive damage award is based in this case.[28]

In particular, Philip Morris points out, the MSA prohibits youth targeting, bans virtually all outdoor and transit advertising, prohibits any agreement to limit or suppress research on the health effects of smoking, and requires the dissolution of the Tobacco Institute and the Council for Tobacco Research.

The purpose of the lawsuits underlying the MSA was to recover the states' costs of providing health care to persons with smoking-related illnesses. (*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.* (2001 3d Cir.) 263 F.3d 239, 241.) The billions of dollars to be paid over the years by the signatory tobacco companies are intended to pay such claims, and to fund measures aimed at reducing underage smoking. (Health & Saf. Code, §§ 104555–104557; see *PTI, Inc. v. Philip Morris Inc.* (C.D.Cal 2000) 100 F.Supp.2d 1179, 1185.)

We note that Philip Morris has referred to no evidence in the record or judicially noticed to support its claim that its share of the payments under the MSA will amount to $20.5 billion in the period ending 2025. For proof of this assertion, Philip Morris refers only to argument in its memorandum of points and authorities in support of its motion for new trial. This is not evidence. (See *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1090 [223 Cal.Rptr. 410].)

The MSA requires payments from all tobacco companies participating in the settlement, according to their relative market shares. "Market share" is defined by the MSA as a percentage of the total number of cigarettes sold in

---

[28] See the MSA online at <http://caag.state.ca.us/tobacco/pdf/1msa.pdf> (as of Apr. 1, 2005).

the 50 United States. "Relative market share" refers to a percentage of the total number of cigarettes shipped in or to the 50 states. Since 1998, Philip Morris has sold fewer cigarettes, which may have reduced its market share. But since there is no evidence in the record of the number of cigarettes sold or shipped by Philip Morris and the other participating tobacco companies, we cannot determine its market share or relative market share, and Philip Morris's figure of $20.5 billion remains just argument.[29]

And Philip Morris has not shown from the provisions of the MSA that its purpose is punitive, rather than compensatory, relying instead upon the comments of a Florida court to that effect. (See, e.g., *Liggett Group Inc. v. Engle* (Fla.Dist.Ct.App. 2003) 853 So.2d 434, 469, review granted May 12, 2004.) Our review of the MSA reveals no provision prohibiting the participating tobacco companies from raising prices to pay the sums called for in the agreement. Since 1998, although Philip Morris has sold fewer cigarettes, it has increased its prices, with the result that revenues were up 47.99 percent in 2000. Philip Morris may simply absorb the cost by raising prices without any competitive disadvantage because the other participants are likely to do the same, and if so, there may be no punitive or deterrent effect as a result of the payments required under the MSA. (See *Grimshaw, supra*, 119 Cal.App.3d at p. 820; cf. *Neal, supra*, 21 Cal.3d at p. 929, fn. 14.)

We agree, however, that the MSA does provide Philip Morris with an incentive not to misrepresent the health risks of its products, and not to target underage smokers with its misrepresentations, since it prohibits it from doing so. On the other hand, it does not deter Philip Morris from adding flavorings and chemicals that make its product more addictive and easier to take into the lungs. It does nothing to deter Philip Morris from marketing defective "light" cigarettes, knowing that they are more dangerous than the ordinary consumer expects.

Given these other incentives and the final punitive damage award in *Henley*, we conclude that more than a single digit multiplier is not justified. But the extreme reprehensibility of increasing addictiveness by manipulating additives, gaining smokers by fraud, and marketing a product that is more dangerous than ordinary consumers expect, knowing that serious physical injury and death will result in many smokers, does justify a ratio of at least 9 to 1. We round off the figure at $50 million.

---

[29] The MSA provides for calculation of shares by an independent auditor.

## DISPOSITION

The judgment is affirmed in all respects except the amount of punitive damages. The judgment is modified to reduce the punitive damage award to $50 million, provided Boeken files a timely consent to such reduction in accordance with rule 24(d), California Rules of Court. If no such consent is filed within the time allowed, the judgment is reversed with regard to the amount of punitive damages only, and remanded for a new trial solely upon that issue. Each side is to bear its own costs on appeal.

Epstein, P. J., and Curry, J., concurred.

A petition for a rehearing was denied April 20, 2005, and the petitions of both respondent and appellant for review by the Supreme Court were denied August 10, 2005. Werdegar, J., did not participate therein.